UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| vs. : | CRIMINAL NO. 3:02CR00366(CFD) |
| ADOLFO PAULINO : | August 15, 2005 |

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

The Defendant, Adolfo Paulino, respectfully submits this memorandum as an aid to the Court as sentencing, and in support of his request that the Court sentence him below the statutory minimum.

**I. Background.**

Mr. Paulino is a fifty-two year old first offender who came to the United States in 1985 to join with his wife and two children who had emigrated several years earlier. A naturalized U. S. citizen, Mr. Paulino and his family have lived in the Bronx, New York, since he came to the U.S. For the first decade he lived in this Country, Mr. Paulino worked for a division of the Goya Food Company. After leaving Goya, Mr. Paulino went into business for himself doing electronics repair.

In the summer of 2001, Mr. Paulino met Oswaldo Vargas (a.k.a. "Chibo") who, initially unknown to Mr. Paulino, was a significant narcotics trafficker. Over time, Mr. Paulino became generally aware of Chibo's inclinations, and on at least two occasions during that summer, Mr. Paulino acted as Chibo's driver so that Chibo could pick up what the government speculates was drug proceeds.

On October 17, 2001, Mr. Paulino agreed to travel to Connecticut to pick up a car for Chibo. Although they did not discuss the specifics of the delivery, Mr. Paulino believed the situation involved drugs. Chibo had given Mr. Paulino a cell phone and instructed him to call the number programmed in it when he arrived in Connecticut. At Chibo's suggestion, Mr. Paulino had his long time friend, Jesus Contreras, accompany him on the trip.

After arriving at a predetermined location in Connecticut, Mr. Paulino called the number in the cell phone, and spoke with a person he now knows to be undercover agent Juan Castillo. Mr. Paulino informed agent Castillo that he had arrived at the predetermined location, and described himself so that

agent Castillo could identify him. Approximately twenty minutes later, agent Castillo met Mr. Paulino, gave him the keys to the car in question, and suggested that if Mr. Paulino intended to "check anything" that he do it away from their current location. Mr. Paulino responded that he was not going to check anything, and proceeded to drive the car away with Mr. Contreras following behind in Mr. Paulino's car. The entire transaction with agent Castillo lasted approximately fifteen seconds.

Prior to turning over the car, the government had installed a "kill switch" in it, which allowed them to disable the engine shortly after Mr. Paulino started driving away. As part of a prearranged plan, the government had local police officers approach the disabled vehicle and ask Mr. Paulino for identification. It is important to note that until this point, federal agents did not know Mr. Paulino's identity as he appeared at no other time during in the course of their extensive investigation. Indeed, it was only because Mr. Paulino handed the officers his proper identification that federal agents learned his identity.

After obtaining Mr. Paulino's information, the officers informed him that they were going to tow the car and that he needed to find another way home. Mr. Paulino was free to leave, and returned to New York with Mr. Contreras. Approximately eighteen months later, on May 7, 2003, federal agents descended upon Mr. Paulino's apartment to arrest him. Upon his arrest, Mr. Paulino gave the agents permission to search his apartment, during which they found a quantity of cocaine in the hall closet for which Mr. Paulino admitted ownership.

Mr. Paulino was arraigned on May 13, 2003, and released on bond. From that date until his detention on December 4, 2003, pursuant to his guilty pleas, Mr. Paulino meticulously abided by the conditions of his release. He found work as a porter in the Bronx, and faithfully kept all appointments with the Probation Office and his counsel, as well as his scheduled court appearances.

## II. Discussion.

As the Court is well aware, it has been freed from the shackles of the sentencing guidelines and need not slavishly adhere to them when imposing sentence in this case. Instead, the Court now has the discretion to determine whether to impose a traditional sentence pursuant to the guidelines, complete

- 3 -

with all its enhancement and departure authority, or impose a "non-guideline" sentence, allowing other factors addressed in 18 U.S.C. § 3553(a) to guide its determination. United States v. Crosby, 397 F.3d 103, 113 (2d Cir. 2005). Before getting to the question of whether to impose "guidelines" or "non-guidelines" sentence, however, the Court must first address the overriding question of whether Mr. Paulino is "safety valve" eligible, and thereby qualifies for a sentence below the statutory minimum of ten years' confinement. 18 U.S.C. § 3553(f); 21 U.S.C. § 841(b)(1).

**A. Safety Valve Eligibility.**

Pursuant to 18 U.S.C. § 3553(f), the Court may sentence Mr. Paulino "without regard to any statutory minium sentence," if it first finds certain enumerated factors. 18 U.S.C. § 3553(f). One factor, the only one presumably at issue in this case, is that Mr. Paulino, "not later than the time of the sentencing hearing . . . has truthfully provided to the Government all information and evidence [he] has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan." 18 U.S.C. § 3553(f)(5). A defendant may satisfy this requirement either by meeting with the government in person or by submitting a written proffer. United States v. Schreiber, 191 F.3d 103, 108 (2d Cir. 1999). In determining whether a defendant has satisfied this requirement, the Court must determine that the "information" he or she provided "was objectively true *and* that he or she subjectively believed that such information was true" as well. United States v. Reynoso, 239 F.3d 143, 146 (2d Cir. 2000)(emphasis in original). When safety valve eligibility is contested, the sentencing court must make specific factual findings as to whether the defendant satisfies the required criteria. United States v. Smith, 174 F.3d 52, 57 (2d Cir. 1999).

In Mr. Paulino's case, he not only met with the government in person, but also submitted a written proffer. See Exhibit A. Each time, he disclosed all the information he possessed regarding the extent of his criminal involvement as well as what he knew about other individuals' conduct. It is understood, however, that the government believes Mr. Paulino did not provide complete disclosure in his proffers, although their reasons for this belief are not entirely clear. Mr. Paulino has two responses to this claim.

- 4 -

First, it is important to note that Mr. Paulino's first proffer came approximately two years after he attempted to pick up the car for "Chibo," and it would be understandable that, due to the passage of time, he might not remember all the details associated with the incident. For example, the government claims that at one point during his fifteen second meeting with agent Castillo, Mr. Paulino uttered the phrase "uno viente" (120), gleaning from this that Mr. Paulino knew the amount of the drugs involved and therefore presumably knew more about the transaction than he indicated.[1] Mr. Paulino, however, honestly does not remember ever having any information about the transaction in question, and does not remember saying "uno viente." Assuming for the sake of argument that Mr. Paulino did utter the phrase, his lack of memory on this point does not render him ineligible for "safety valve" consideration. See Reynoso, 239 F.3d 143, 153 (Calabresi J., dissenting). Indeed, in light of the holding in Reynoso, it is proper for Mr. Paulino to honestly indicate that he does not remember a particular fact than to say something that he does not know for certain is the truth. Id. at 146.[2] Given all these considerations, the government cannot fault or penalize Mr. Paulino simply because he honestly does not remember particular facts surrounding the events in question.

Second, it appears that the government's frame of reference regarding what occurred in this case is based largely if not solely on information provided by individuals who have pled guilty and agreed

---

[1] It is important to note that the sole source of this claim is agent Castillo, who testified to this fact nearly three years later at the trial of Mr. Paulino's co-defendant. Importantly, though, in his report documenting his encounter with Mr. Paulino, agent Castillo makes no mention that Mr. Paulino made the statement, although agent Castillo does document other statements Mr. Paulino made. Moreover, Mr. Paulino retained the services of an expert to examine the audio tape which contains the conversation in question in an effort to determine who utters the phrase "uno viente." See Exhibit B. Based on the poor quality of the tape, however, the expert was unable to determine who uttered the phrase.

[2] To be sure, Mr. Paulino knows full well that he could virtually ensure "safety valve" eligibility by simply stating that he knew the transaction in question involved 120 kilograms of cocaine, and that by not doing so he risks receiving a minimum of ten years' in prison. The fact that he cannot adopt this statement, despite what he risks, actually makes it more likely that Mr. Paulino either did not say "120," or does not remember saying it. In either scenario, Mr. Paulino would still be "safety valve" eligible.

- 5 -

to assist the government in exchange for the prospect of a lower sentence based on the extent and scope of their cooperation. For example, counsel for Mr. Paulino is in possession of investigative reports documenting proffer sessions the government conducted with Oscar Gonzalez and Carlos Aquino. These reports indicate that both individuals provided the government with information concerning Mr. Paulino's alleged involvement in criminal activity. As the Court knows, Mr. Gonzalez received a sentence of 33 months' incarceration for his involvement in this case, which was a significant departure from his recommended guideline range of 108-135 months. Additionally, Mr. Aquino testified for the government at the trial of Mr. Paulino's co-defendant, Mr. Contreras, and the government is expected to file a motion for a reduced sentence in exchange for this cooperation. Given this, the government's source for its information concerning the extent of Mr. Paulino's involvement is itself suspect. Indeed, the only thing of which the government is independently certain is that over the course of an extensive, international, multi-agency investigation spanning several years, Mr. Paulino surfaces on only one occasion, and until he provided officers with his correct identification, his identity was unknown. In light of all these considerations, it is reasonable for the Court to conclude that Mr. Paulino satisfies all five requirements under 18 U.S.C. § 3553(f), and therefore is "safety valve" eligible. Accordingly, the Court can sentence Mr. Paulino without regard for any statutory minimum sentence.

As a final point, Mr. Paulino notes that the Second Circuit is currently considering what effect the Supreme Court's decision in United States v. Booker, ___ U.S. ___, 125 S. Ct. 738 (2005), has on the safety valve provision in § 3553(f). See United States v. Holguin, C.A. No. 04-5277-cr (2005). The appellant in that case has argued that § 3553(f), like other aspects of 18 U.S.C. § 3553 that before Booker limited a court's ability to depart downward from the sentencing guidelines, is now advisory, and a court therefore can grant "safety valve" relief without a specific finding of all five requirements. Mr. Paulino respectfully suggests that the Court may wish to defer ruling on Mr. Paulino's "safety valve" eligibility until the Second Circuit provides further guidance on this issue.

**B. Guideline Calculation and Departure Grounds.**

Consistent with the Second Circuit's instruction in Crosby, this Court, while not bound by the

- 6 -

sentencing guidelines, must "consider" them. Crosby, 397 F.3d at 112-13. To discharge this duty, the Court must calculate the guidelines and consider any applicable departure grounds. Id. at 113. Accordingly, Mr. Paulino raises the following arguments pertaining the guideline calculation in this case.

**1. Determining which version of the sentencing guidelines apply.**

It is commonly accepted that courts will use the version of the sentencing guidelines in effect at the time of a defendant's sentencing unless doing so would constitute an *ex post facto* violation. United States v. Keller, 58 F.3d 884, 889-90 (2d Cir. 1995). Such a violation occurs when the version of the guidelines in place at the time of sentencing would, on a whole, call for a more severe penalty than that called for by the version in place at the time the defendant committed the offense of conviction. Id. If such a situation exists, the court must then apply the version of the guidelines in effect on the date the defendant committed the offense of conviction. Id. at 890.

In Mr. Paulino's case, the presentence report (PSR) used the November 2003 edition of the guidelines to calculate Mr. Paulino's guideline range. PSR at ¶ 24. Under this version, a defendant is eligible for a three-point reduction to his offense level for accepting responsibility only upon a motion from the government essentially stating that the defendant is entitled to such a reduction. U.S.S.G. § 3E1.1(b) (2003). Without this motion, the defendant is only entitled to a two-point reduction. Id. However, as stated above, at least one of the offenses to which Mr. Paulino pled guilty occurred prior this version of the guidelines becoming effective. The guideline version in effect at the time of this offense would have permitted a full three-point reduction for acceptance of responsibility without a motion from the government. U.S.S.G. § 3E1.1(b) (2000). Accordingly, given that the 2003 version of the guidelines is more onerous upon Mr. Paulino to the extent it limits his ability to obtain a full three-point reduction for accepting responsibility, to avoid *ex post facto* implications this Court should use either the 2000 or 2002 version of the guidelines. United States v. Santopietro, 166 F.3d 88, 96 (2d Cir. 1999) *abrogated on other grounds* Sabri v. United States, 541 U.S. 600 (2004). Moreover, because Mr. Paulino informed the government in a reasonable amount of time of his intention to not only plead

- 7 -

guilty to the offense for which he was charged in this District but also for the drugs found in his New York apartment, he is entitled to a full three-point reduction § 3E1.1(b) for acceptance of responsibility.

**2. Mitigating role adjustment.**

Section 3B1.2 of the guidelines "provides a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant." U.S.S.G. § 3B1.2, comment. (n.3). For example, a defendant is entitled to a four-level reduction in his offense level if he played a "minimal role" in the offense. "[T]he defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as a minimal participant." Id. comment. (n.4). In Mr. Paulino's case, the evidence demonstrates that his role in the offenses in question, when compared to that of other individuals that were the focus of the government's investigation or a typical defendant with the same offense of conviction, qualifies him for a "minimal role" reduction.

Government documents establish that the government's investigation in this case was extensive. The investigation began in Houston, Texas, where DEA agents became aware of an international paramilitary cocaine trafficking organization that was planning a delivery of approximately 120 kilograms of cocaine to Connecticut. Agents learned that a large scale drug trafficker in the Connecticut/ New York area, whose name the government has withheld from Mr. Paulino, intended to accept this shipment. Texas agents intercepted this shipment, unknown to the recipient in Connecticut, and with the help of local agents here in Connecticut set up a controlled delivery. Undercover agents in Connecticut made numerous telephone calls over the course of a two day period in October 2001 to an individual identified as "Luciano," wherein the parties arranged for the transfer of the cocaine. At no point, did Mr. Paulino's name appear in any of these conversations, or anywhere else in the investigation.

As mentioned before, Mr. Paulino first came to the government's attention on October 17, 2001, when he attempted to pick up the car for "Chibo." Based on the information the government provided, this was Mr. Paulino's only involvement in the case. There is no indication that Mr. Paulino exercised

- 8 -

any authority over the proposed shipment, could negotiate price, could delegate its distribution, or was entitled to a share of the proposed profits from its anticipated sale. To the contrary, Mr. Paulino, by all accounts, was simply a courier, tasked with picking up the car and delivering it to "Chibo." Moreover, there is no evidence Mr. Paulino was aware, let alone understood the scope of the enterprise "Chibo" operated. Again, Mr. Paulino seems to have been, for lack of a better term, one of "Chibo's" "runners." This does not mean Mr. Paulino is not accepting responsibility for his actions, it is just that his involvement was minimal. Accordingly, he is entitled to a four-level reduction under § 3B1.2(a) of the guidelines.

Alternatively, if the Court finds that Mr. Paulino is not eligible for a four-level reduction, he at a minimum is entitled to a two-level reduction as a "minor" participant. U.S.S.G. § 3B1.2(b). A defendant qualifies as a minor participant if he is "less culpable than most other participants, but whose role could not be described as minimal." In this case, there can be no question that Mr. Paulino's role in the offense was much less than "Chibo," or even Oscar Gonzalez or Carlos Aquino. Mr. Paulino was simply the runner. He had no authority over any contraband or other individuals. For these reasons, he was likewise less culpable than the average defendant convicted of an identical offense. See United States v. Ajmal, 67 F.3d 12, 18 (2d Cir. 1995) (noting that a sentencing court must compare a defendant's culpability not only against other individuals engaged in the enterprise in question but also against the typical defendant of the offense of conviction). Accordingly, Mr. Paulino is entitled to a mitigating role adjustment.

### 3. Amended guideline calculation.

In light of the aforementioned changes, Mr. Paulino's guideline calculation calls for a sentencing range of either 37-46 months or 46-57 months imprisonment, depending on how the Court resolves the mitigating role question. To start, it is undisputed that Mr. Paulino falls into criminal history category I. Additionally, regardless of whether the Court finds that Mr. Paulino played a "minimal" or "minor" role, a decision to grant any mitigating role reduction establishes for Mr. Paulino a base offense level of 30 pursuant to U.S.S.G. § 2D1.1(a)(3). From this, two points are subtracted pursuant to U.S.S.G.

- 9 -

§ 2D1.1(b)(6) based on Mr. Paulino's "safety valve" eligibility. Moreover, three points are subtracted pursuant to U.S.S.G. § 3E1.1(b) for acceptance of responsibility. Finally, if the Court finds Mr. Paulino played a "minimal" role pursuant to U.S.S.G. § 3B1.2(a), an additional four points are subtracted, giving Mr. Paulino a total offense level of 21 and a sentencing range of 37-46 months confinement. If, instead, the Court finds that Mr. Paulino only played a "minor" role, then two points are subtracted, giving Mr. Paulino a total offense level of 23 and a sentencing range of 46-57 months confinement.

**4. Departure grounds.**

Regardless of which sentencing range the Court ultimately determines applies in this case, Mr. Paulino respectfully asserts that he is entitled to a downward departure. Pursuant to § 5K2.0 of the guidelines, the Court may depart from a recommended guideline range if it finds a "mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." U.S.S.G. § 5K2.0 (2002).[3] Accordingly, Mr. Paulino respectfully asserts that a legitimate departure basis exists given both the length of time before Mr. Paulino's first conviction as well as his expected age upon release. United States v. Nellum, 2005 WL 300073, *3 (N.D. Ind. Feb. 3, 2005); United States v. Ward, 814 F. Supp. 23, 24 (E. D. Va. 1992). While it is true that a defendant's age will not normally justify a downward departure, see U.S.S.G. § 5H1.1, a departure in Mr. Paulino's case would not be based specifically on his age alone. Instead the departure would be based on the consideration that for approximately fifty years Mr. Paulino led a law abiding life, as well as the fact he is currently fifty-years old and a remarkably low threat of recidivism.

---

[3] This language simply mirrors the statutory authority Congress provided for a departure in 18 U.S.C. § 3553(b). Given that the Supreme Court excised this language in Booker, however, it is questionable whether this language can still exist in the guidelines, or whether it likewise must be eliminated. Nevertheless, given that Mr. Paulino committed his offenses of conviction prior to Booker, and that eliminating this language would retroactively make the guidelines more onerous for Mr. Paulino, *ex post facto* considerations warrant maintaining this language for Mr. Paulino's sentencing. See generally Lindsey v. Washington, 301 U.S. 397, 401-04 (1937) (holding that *ex post facto* considerations prohibited retroactive application of a statute mandating a fifteen year sentence when, at the time the defendant committed his offense, the statute permitted a sentencing range of six-months' to fifteen years' confinement).

In Ward, a case involving a forty-nine year old defendant, the court departed based on the length of time before the defendant's first offense because it found that the Sentencing Commission failed to take into account the length of time an individual might go before sustaining their first conviction. Id. The court reasoned in that case that:

> [w]hile awarding defendants generally and this defendant individually some credit for leading relatively crime-free lives, the Criminal History Category of the Sentencing Guidelines does not account for the length of time a particular defendant refrains from criminal conduct. Thus, for example, the guidelines do not distinguish between a nineteen-year-old and a sixty-year-old, both of whom had led crime-free lives and consequently are assigned the same low Criminal History Category . . . the longevity of the sixty-year-old's criminal history is not taken into account . . . [T]he length of time a person refrains from the commission of crimes . . . is a factor that is critical to a court's determination of the sentence it should impose.

Ward, 814 F. Supp. at 24. This logic applies with equal force in Mr. Paulino's case.

Additionally, a departure is warranted given the extremely low threat of recidivism Mr. Paulino presents upon release. Even under the best case scenario for Mr. Paulino, he will be in his mid to late fifties when he is released from prison. As the United States Sentencing Commission has documented, recidivism rates drop dramatically with age. See Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, at 12 (May 2004). For example, "[a]mong all offenders under age 21, the recidivism rate is 35.5 percent, while offenders over age 50 have a recidivism rate of 9.5 percent." Id. For offenders over fifty in criminal history category I, like Mr. Paulino, the recidivism rate drops to 6.2 percent. Id. at 28. The guidelines, however, do not take this fact into account, just as it does not adequately take into account the fact that Mr. Paulino live neared fifty years without a conviction. Accordingly, a departure is warranted under § 5K2.0.

### C. Determination of Whether to Impose a "Guideline" or "Non-Guideline" Sentence.

As mentioned earlier, the Court is no longer bound by the sentencing guidelines, and while it must "consider" the recommended guideline range in fashioning a sentence, it may impose any sentence it deems just and "reasonable." While Mr. Paulino believes that the Court may legitimately impose a sentence within a range of 37-46 months confinement under operation of the guidelines, if the Court feels unduly constrained by the rigid and formulaic operation of the guidelines it may impose a similar

- 11 -

sentence as a "non-guideline" sentence. See United States v. Brady, ___ F.3d ___, 2005 WL 1706509, *9 (2d Cir. July 22, 2005). In considering whether to impose a "non-guidelines" sentence, Mr. Paulino makes the following observation.

In his remedial decision in Booker, Justice Breyer acknowledged that while the Court's result in that case did not remain exactly true to the sentencing system Congress enacted, it "nonetheless continue[d] to move sentencing in Congress' preferred direction, helping to avoid excessive sentencing disparities while maintaining flexibility sufficient to individualize sentencing where necessary." Booker, 125 S. Ct. at 767 (emphasis added). Thus, while Booker requires courts to "consider" the guidelines, it recognizes that at times sentencing courts will need to deviate from the guidelines in order to "individualize" a sentence. These times occur where a defendant's "history and characteristics" present significant mitigating circumstances. 18 U.S.C. § 3553(a)(1). As is well known, the sentencing guidelines and its calculations focus exclusively on the conduct and circumstances of the offense and not the offender. Indeed, the guidelines prohibit consideration of many of a defendant's mitigating characteristics. See U.S.S.G. §§ 5H1.1 - 5H1.12. These prohibitions sit in stark contrast to the primary mandate in § 3553(a) that "[t]he court, in determining the particular sentence to be imposed" must "consider the history and characteristics of the defendant." 18 U.S.C. § 3553(a). In light of Booker, this mandate takes on even greater significance and provides a court with greater discretion to arrive at what it deems is a just and "reasonable" sentence. See Brady, 2005 WL 1706509, *9. Thus, in light of the Court's expanded discretion post-Booker, Mr. Paulino respectfully asserts that if the Court feels constrained to rule in Mr. Paulino's favor on any of the aforementioned issues under a guideline scenario, it may more easily accept such arguments under the more liberal context of a "non-guideline" sentence.

## III. Conclusion.

Mr. Paulino comes before this Court fully contrite for his conduct and with complete realization that his behavior has not only hurt himself and his family, but society in general. It bears repeating, however, that Mr. Paulino is a fifty-two year old first offender, who presents a tremendously low threat

- 12 -

of recidivism. Moreover, the evidence in this case establishes that Mr. Paulino played an extremely small role in an international conspiracy, the scope and extent of which Mr. Paulino did not have knowledge. To be sure, Mr. Paulino simply served at the pleasure of "Chibo," basically serving as a courier or a "runner." Mr. Paulino was not involved in any way with the particulars of "Chibo's" operation. He exercised no control over any member of the "Chibo's" organization, was not involved in any of "Chibo's" negotiations, and did not have any stake in the drugs in which "Chibo" dealt. Accordingly, Mr. Paulino respectfully requests the Court find that he is "safety valve" eligible "minimal" participant who is entitled to a downward departure due to his age and low threat of recidivism. Accordingly, his sentence should reflects these characteristics.

          Respectfully submitted,

          THE DEFENDANT,
          ADOLFO PAULINO

          THOMAS G. DENNIS
          FEDERAL DEFENDER

Dated: August 15, 2005

          Thomas P. Belsky
          Asst. Federal Defender
          2 Whitney Ave., Suite 300
          New Haven, CT 06510
          Bar No. ct24770
          (203) 498-4200
          Email: thomas.belsky@fd.org

## CERTIFICATION

    I HEREBY CERTIFY that a copy of the foregoing has been mailed to James Filan, Assistant United States Attorney, United States Courthouse, 915 Lafayette Boulevard, Bridgeport, CT 06604, on this 15th day of August 2005.

          Thomas Belsky

# EXHIBIT A

FEDERAL DEFENDER
DISTRICT OF CONNECTICUT
2 WHITNEY AVENUE, SUITE 300
NEW HAVEN, CONNECTICUT 06510

THOMAS G. DENNIS
FEDERAL DEFENDER

TEL: (203) 498-4200
FAX: (203) 498-4207

August 11, 2005

James K. Filan
Assistant United States Attorney
U.S. Attorney's Office
915 Lafayette Boulevard
Bridgeport, CT 06604

**Re: U.S. v. Adolfo Paulino**

Dear Attorney Filan:

Please accept this letter as Mr. Paulino's proffer for "safety valve" eligibility pursuant to 18 U.S.C. § 3553(f). As you may know, the Second Circuit has recognized that a defendant may communicate a "safety valve" proffer via letter. United States v. Schreiber, 191 F.3d 103, 108 (2d Cir. 1999). This information below is based on my meeting with Mr. Paulino during which he provided the said information.

As mentioned during his initial proffer back in October of 2003, Mr. Paulino met "Chibo" (a.k.a. Oswaldo Vargas) in the summer of 2001. Mr. Paulino met "Chibo" through Julio Cuello, an individual Mr. Paulino knew from the Dominican Republic. On at least two occasions during the summer of 2001, Mr. Paulino remembers driving "Chibo" to various locations so that "Chibo" could pick up money. Mr. Paulino believes this money was related to "Chibo's" drug business.

On October 17, 2001, Mr. Paulino met "Chibo" at a local restaurant at "Chibo's" request. "Chibo" asked Mr. Paulino if he would travel to Connecticut to pick up a car for him. "Chibo" gave Mr. Paulino a cell phone, and instructed him that when he arrived in Connecticut to call the number programmed in it and follow the direction of the person he contacts. "Chibo" also suggested Mr. Paulino have his long time friend, Jesus Contreras, accompany him on the trip.

After the incident regarding the car, documented in the government's various reports, Mr. Paulino returned to "Chibo" to explain what happened. In fact, "Chibo" called while the police were still with Mr. Paulino in Connecticut, and Mr. Paulino informed him that the car had broken down. Once back in New York, Mr. Paulino gave "Chibo" the business card of the towing company where the tow truck operator took the car. "Chibo" then arranged for Mr. Paulino to return to Connecticut the next day with a tow truck driver from New York in an effort to retrieve the car. However, while en route to Connecticut, Mr. Paulino and the driver learned that they would not be able to retrieve the car. Mr. Paulino then paid the driver $250 for his time, and informed "Chibo" of what

James K. Filan
August 11, 2005
Page 2 of 2

happened.

Turning next to the drugs found in Mr. Paulino's apartment the day of his arrest, government agents seized a quantity of drugs from the apartment's hall closet as well as from the bedroom of Mr. Paulino's son. The drugs in the hall closet belonged to an individual named Julio Ceasar. Mr. Ceasar gave them to Mr. Paulino to "cut" and package. Mr. Ceasar would pay Mr. Paulino for his services. Mr. Ceasar had given Mr. Paulino drugs to package before, and he did this to give Mr. Paulino work.

The drugs found in his son's room belonged to an individual Mr. Paulino knows only as Richard. The drugs were mostly "cut," and were given to Mr. Paulino in December of 2002. Richard was killed in the Dominican Republic in January 2003, and he had given the drugs to Mr. Paulino to hold before he left for the Dominican Republic. For his efforts, Richard gave Mr. Paulino five grams of cocaine for his personal use.

This information represents the extent to what Mr. Paulino remembers about the incidents in question. If the government has any questions based on this information, Mr. Paulino will be happy to try to answer them. Mr. Paulino respectfully requests the government accept both this letter and Mr. Paulino's October 2003 proffer as satisfying the requirement under 18 U.S.C. § 3553(f)(5). If you have any questions, please do not hesitate to contact me.

Very truly yours,

Thomas P. Belsky
Asst. Federal Defender

TPB/mf

# EXHIBIT B

 **Voice Identification, Inc.**

P.O. BOX 714 • SOMERVILLE, N.J. 08876 • 908-526-3408 • FAX 908-526-5714

Aug. 9, 2005

Federal Defender, Dist. of Connecticut
att: Thomas P. Belsky, Asst. Fed. Defender
2 Whitney Ave., Suite 300
New Haven, CT   06510

Re: US v. Alolfo Paulino

Dear Sir:

    We have received two recordings from you with instructions to attempt a voiceprint identification comparing the known exemplar of Mr. Paulino to an unidentified male speaker on an undercover tape recording (040401252 ZB "Enhanced copy of Q1 (N7)").

    Before conducting a voiceprint comparison of questioned and known voice recordings, we begin with a preliminary examination of the tape recordings involved. The purpose of this preliminary work is to determine whether the length, quality and nature of the recordings are sufficient to perform a voiceprint analysis. Typically, we need to have at least 20 usable words in the questioned recording which are then compared to the same words spoken by the suspect(s). The questioned recording (and the known exemplars) must have a frequency response range of at least 300-3000 Hz to provide us with enough speech patterns for a meaningful comparison. The recording must also be relatively free of random background sounds and distortion that might mask the voice patterns. In addition, we determine whether the speaker(s) have used a disguise or otherwise altered their normal voices, ie. whispering, to the extent that comparison would not be possible.

    From our analysis of the questioned undercover recording, we determined that there were several problems that would prevent us from reaching any meaningful results.

1. The recording appeared to be made using a radio frequency transmitter/receiver system to gather the audio from the conversation taking place at some distance. These transmitters typically have a poor frequency response and are often prone to system and airway noise.

2. All nearside/farside party information that would be apparent from a recording made into a live microphone and recorder were lost. Thus it became difficult to even know who to attribute which line of the conversation to. It was also difficult to determine how many people might have been speaking.

3. The signal-to-noise ratio on the undercover recording was so poor that the voices barely rose in level above the background noise.

4. The amount of conversation was very limited, with much of it being unintelligible.

5. Those words that were understandable made very poor prints, yielding little information for comparison to the known exemplar.

As a result of the lack of recording quality and insufficient word quantity, we feel that it is not worth pursuing a voiceprint comparison of Mr. Paulino's voice to any of the questioned male voices on the undercover recording.

We are sorry that we could not be of greater service to you on this matter. Should you and your office be in need of audio analysis, transcription or voice identification in the future, please feel free to call on us.

Sincerely,

Linda C. Chiari
Certified Voiceprint Examiner

Ernst F.W. "Rik" Alexanderson
Certified Voiceprint Examiner
President