```
                  UNITED STATES DISTRICT COURT
                    DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA      :    CRIM. NO. 3:02CR366 (CFD)
                              :
v.                            :
                              :
ADOLFO PAULINO                :    OCTOBER 18, 2005
```

**UNITED STATES' SENTENCING MEMORANDUM**

**INTRODUCTION**

Defendant Adolfo Paulino stands convicted after a guilty plea of conspiracy to possess with intent to distribute five kilograms or more of cocaine and possession with intent to distribute cocaine. The proffer set forth by the government at the time of the defendant's guilty plea on both counts as well as the evidence at the trial of the defendant's co-defendant, Jesus Contreras, demonstrated that a 220 kilogram shipment of cocaine was intercepted by law enforcement in Central America. After the cocaine was intercepted, Drug Enforcement Administration ("DEA") agents acting in an undercover capacity made arrangements to deliver 70 kilograms of the cocaine to the ultimate purchasers.

On October 16, 2001, as part of a conspiracy to possess with intent to distribute the intercepted cocaine, members of the drug trafficking organization, including, among others, Carlos Aquino, Oscar Gonzalez and Hugo Jorge, traveled from New York City to Norwalk, Connecticut, to deliver a "load" car, that is, the car into which the undercover DEA agent agreed to place the 120 kilograms of cocaine. The load car was driven by Jorge and

Gonzalez was a passenger.  Aquino traveled to Connecticut in another automobile with at least two other conspirators.

After extensive discussions between Gonzalez, Jorge, Aquino, other co-conspirators and the undercover government agent, Gonzalez and Jorge agreed to leave the load car overnight in Connecticut so that undercover government agents could place the cocaine in the car.  Arrangements were made for other members of the drug trafficking organization, including defendant Paulino, to pick up the load car containing 120 kilograms of cocaine on October 17, 2001.

On the evening of October 16, 2001, after the load car had been turned over to the undercover government agent, DEA agents installed a court-authorized "kill switch" in the car.  The purpose of the kill switch was to allow the DEA agents to remotely disable the car after the drug traffickers, including the defendant Paulino, picked up the cocaine packed car.

On October 17, 2001, members of the drug trafficking organization, including Paulino, had consensually-monitored telephone conversations with undercover government agents regarding the time, place and manner in which the load car and its contents would be retrieved.  An unindicted co-conspirator explained in a consensually-monitored telephone conversation that two people would be sent to pick up the load car at an agreed-upon location.  Paulino explained what he and Contreras would be

wearing at the time the cocaine-packed car would be picked up.

On October 17, 2001, government agents videotaped Paulino and Contreras for an extended period of time waiting at the pickup location.  The undercover government agent then drove the load car to the pick up location where he met with Paulino and Contreras and gave the keys to the load car to Paulino.  At the time the cocaine packed load car was transferred, the undercover agent told Paulino and Contreras that if they were going to check the merchandise in the trunk they should do it elsewhere.  In addition to being videotaped, this meeting among the undercover agent, Paulino and Contreras was also audiotaped.

After meeting with the undercover agent, Contreras drove Paulino to the load car where Paulino got in and drove out of the parking lot onto Route 1/Connecticut Avenue in Norwalk.  Contreras followed in his car.  At the first traffic light at which the load car stopped, DEA agents activated the kill switch, thereby disabling it.  At approximately 3:55 p.m., when the load car was first disabled, Contreras used his car to push the load car out of the intersection.  Minutes later, uniformed members of the Norwalk Police Department, who were acting at the direction of the DEA, approached the load car pretending to make a routine check on a stalled car.  Paulino got out of the load car and spoke with the Norwalk police officers.

Contreras drove away on Connecticut Avenue and turned into

the parking lot of a Kentucky Fried Chicken approximately ½ mile from the intersection where the load car was disabled.  Contreras then got out of his car and walked to the trunk, which he opened, took out a shirt and changed his clothing.  Contreras then walked away from his car through the back lot of a business and onto Connecticut Avenue in the direction of the stalled load car.  A government agent observed Contreras walk close to the intersection where the load car was stalled.  Contreras looked over a rise in the highway and then walked back to his vehicle.

Contreras got back into his car and drove up Connecticut Avenue and parked across the street from where the load car was stalled.  Contreras briefly entered a store and then returned to his car.  Contreras then drove up Connecticut Avenue and drove slowly past the stalled load car.  At approximately 4:15 p.m., a towing company removed the load car from Connecticut Avenue.  Paulino then walked south on Connecticut Avenue where he was observed talking on a cellular telephone and meeting with Contreras.  Afterwards, Contreras drove his car onto Interstate 95 and traveled southbound.

Concerning the Information, at the time of his arrest the defendant possessed with the intent to distribute hundreds of grams of cocaine.

## THE PRESENTENCE REPORT

The PSR found that the transaction in this case involved 120

kilograms of cocaine. The defendant has no Criminal History points, which places him in Criminal History Category I. The Drug Quantity Table, Section 2D1.1 of the guidelines, places the defendant at Level 36, for at least 50 kilograms but less than 150 kilograms of cocaine. The PSR gives the defendant two levels for acceptance of responsibility, and the defendant claims that because he could have received three levels using the Guidelines in effect at the time of his conduct, 2002, the 2002 Guidelines should apply. As the use of the 2002 Guidelines does not effect any other aspect of the sentencing, the government does not object to their use and the award of three levels for acceptance of responsibility. Thus, while the PSR calculates the defendant's sentencing guidelines range as Criminal History Category I, Offense Level 34, with a resulting range of 151 to 188 months, the actual Adjusted Offense Level based on the additional point for acceptance is Level 33, with a resulting range of 135 to 168 months.

## THE DEFENDANT'S CLAIMS

The defendant has filed a sentencing memorandum in which he makes several claims. First, the defendant claims that he is entitled to safety-valve consideration under 18 U.S.C. § 3553(f). Second, the defendant claims that a version of the Guidelines other than the 2003 version should be used because it is the only way be can received a full three-level adjustment for acceptance

of responsibility.[1]  Third, the defendant claims he is entitled to a mitigating role adjustment and the amended guideline adjustment that flows from that award.  Fourth, he claims that he is entitled to a departure on age.  Finally, he claims that he is entitled to a non-Guideline sentence.  The government will address each of these claims below.

## DISCUSSION

A.  Safety Valve Consideration

The defendant first claims that he is entitled to safety valve consideration.  The government maintains that the defendant does not satisfy the requirements because he has not been fully forthcoming in his statements to the government.

Since 1984, Congress has enacted a series of laws that establish mandatory minimum penalties for certain crimes, "the aim of which was to provide a meaningful floor in sentences for certain serious federal controlled substance and weapons-related offenses."  H.R. Rep. No. 103-460, at 3 (1994).  In general, Congress sought to establish a two-tier system under which "kingpin" drug traffickers faced 10-year mandatory minimum sentences, and "middle-level" traffickers faced at least 5 years in prison.  Id. at 3-4.  For example, in the case of a defendant who is convicted of possessing with intent to distribute 500

---

[1] As the government does not object to using the 2002 Guidelines, that claim is moot and will not be addressed by the government.

grams or more of cocaine, in violation of 21 U.S.C. § 841(b)(1)(B), "such person shall be sentenced to a term of imprisonment which may not be less than 5 years and not more than 40 years . . . ." When the Guidelines were first promulgated in 1987, the Sentencing Commission designed the guidelines governing drug offenses to work in concert with the mandatory minimum sentences already established by statute. Id. In general, "sentences for offenses involving drug quantities that would trigger a mandatory minimum equate with a guideline sentence of at least that length," and the presence of aggravating factors leads to longer sentences under the Guidelines. Id. Compare, e.g., 21 U.S.C. § 841(b)(1)(A) (listing drug quantities that trigger 10-year mandatory minimum sentences) with U.S.S.G. § 2D1.1 (drug quantity table) (1987) and § 2D1.1(c)(4) (2004) (listing those same quantities as triggering offense level 32 which, coupled with Criminal History Category I, call for guideline range of 121-151 months); and compare 21 U.S.C. § 841(b)(1)(B) (listing quantities that trigger 5-year minimum) with U.S.S.G. §§ 2D1.1 (drug quantity table) (1987) and § 2D1.1(c)(7) (2004) (same quantities trigger offense level 26 which, with Criminal History Category I, call for guideline range of 63-78 months).

Congress later recognized, however, that this system did not always leave room for recognition of mitigating factors (such as

acceptance of responsibility or reduced role in the offense) in cases involving the lowest-level offenders whose guideline sentences were at the mandatory minimum.  Id.  In 1994, in order to remedy this defect, Congress enacted 18 U.S.C. § 3553(f), commonly known as the "safety valve."  That provision authorizes district courts to impose sentences below the statutory minimum in certain limited circumstances.  As the legislative history reports, the goal of this legislation was to "permit a narrow class of defendants, those who are the least culpable participants in such offenses, to receive strictly regulated reductions in prison sentences for mitigating factors currently recognized under the federal sentencing guidelines."  H.R. Rep. 103-460, at 2 (emphasis added).  The "safety valve" was designed so that mandatory minimum sentences continued to apply to those guilty of "relatively more serious conduct," while allowing mitigating factors to be applied through the Guidelines to the "least culpable offenders."  Id.  See also United States v. Reynoso, 239 F.3d 143, 148 (2d Cir. 2000) ("Congress intended to provide relief from statutory minimum sentences to those defendants who, but for their minor roles in criminal activity, could (and would) have provided the Government with substantial assistance.") (emphasis in original).

  In order to identify these "least culpable offenders," id., § 3553(f) lists five criteria that must be satisfied in order for

a court to impose a sentence below a mandatory minimum sentence in certain narcotics cases.  The subsection reads in its entirety as follows:

> (f) Limitation on applicability of statutory minimums in certain cases.-- Notwithstanding any other provision of law, in the case of an offense under section 401, 404, or 406 of the Controlled Substances Act (21 U.S.C. 841, 844, 846) or section 1010 or 1013 of the Controlled Substances Import and Export Act (21 U.S.C. 960, 963), the court shall impose a sentence pursuant to guidelines promulgated by the United States Sentencing Commission under section 994 of title 28 without regard to any statutory minimum sentence, if the court finds at sentencing, after the Government has been afforded the opportunity to make a recommendation, that--
>
> (1) the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines;
>
> (2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;
>
> (3) the offense did not result in death or serious bodily injury to any person;
>
> (4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in section 408 of the Controlled Substances Act; and
>
> (5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

U.S.S.G. § 5C1.2 incorporates each of these statutory requirements nearly verbatim. It also establishes a minimum offense level of 17, based on application of Chapters Two (Offense Conduct) and Three (Adjustments) of the Guidelines Manual, for safety-valve eligible defendants.

Here, the government does not dispute that the defendant satisfies factors (1) through (4). The defendant has not, however, been truthful to the government concerning his role in the offense. Indeed, the defendant has given a number of misleading statements to the government, the Court and the probation office. For instance, at the time of his guilty plea, the following exchange took place:

    THE COURT:    Mr. Paulino, do you agree with the prosecutor's summary of what you did?

    THE DEFENDANT: Yes.

    THE COURT:    Is there anything that he said that you disagree with?

    THE DEFENDANT: Regarding the 120 kilos, I didn't know about that amount.

    THE INTERPRETER:    Your Honor, the interpreter is going to confirm the last statement.

    THE DEFENDANT: I didn't know what the amount was.

    THE COURT:    Mr. Paulino, did you know that in the load car there was going to be ten kilograms of cocaine?

THE DEFENDANT: I didn't know what amount they were going to put in.

THE COURT: Did you know that it was going to be over five kilograms of cocaine?

THE DEFENDANT: No.

Guilty Plea Tr. at 39-40.

In his interview with the probation officer, the defendant "stated that the man arrived with the car and approached him. Mr. Paulino was supplied the keys to the car and was informed that there was "120 kilos in the trunk. He told me not to look." PSR § 22. At that point defense counsel terminated the interview.

At the time he was interviewed by the government, the defendant gave conflicting statements, first saying that he knew there were drugs in the trunk and then saying that he knew there was "something" in the trunk and that it was either drugs or money. Further, in his sentencing memorandum, the defendant has now states that he does not remember having any information about the transaction in question. The bottom line regarding the amount is that the defendant has given conflicting statements about what he knew and when he knew it and his inability to tell the truth precludes him from receiving safety-valve consideration.

Moreover, the defendant has minimized his role in Chibo's

drug trafficking organization. For instance, he stated to the government that he only drove Chibo around on two occasions; yet the government has evidence that this information is not accurate. Further, the defendant has made blatantly false statements about the drugs that were found in his son's possession at the time of his arrest. He now states that the drugs in his son's room belonged to a person who is now dead. At the time of his arrest, however, the defendant made no such statement. Indeed, these statements are only being used to offer his son, who was convicted in federal court in New York of a drug charge based on the drugs found in his closet, an appellate issue. Indeed, it was used in an effort to help his son get a new trial. It should be noted that the defendant did not come forward with this explanation until after his son was convicted on that charge. Again, the bottom line is that the defendant is manipulating the judicial system, government agents and the Court to serve his own interests. He has not been truthful about his role in the offense or his knowledge about the transactions.

Indeed, the best evidence of the knowledge that Paulino had concerning the drug trafficking and his role in it is the transcript of the conversations presented at trial. As the Court is aware, the undercover agent spoke with Paulino right before the load car was picked up and Paulino informed him that "everything is calmed." He informed the undercover agent that he

was ready and that he was there on behalf of "The Animal." Finally, the defendant stated "we don't screw around, you know." This is evidence that was believed by the jury, shows that Paulino knew exactly what was going on, and that he was part of an organization that did not screw around. His protestations that he was unaware of what was transpiring are unavailing and his incomplete and inconsistent statements demonstrate that he has not satisfied the requirements for earning a safety-valve reduction.

    B.    <u>Acceptance of Responsibility</u>

As the government does not object to the use of the 2002 Guidelines, the defendant's ex post facto claim is moot.

    C.    <u>Minor Role</u>

The defendant bears the burden of proving his reduced level of culpability by a preponderance of the evidence. <u>See, e.g.</u>, <u>United States v. Castano</u>, 234 F.3d 111, 113 (2d Cir. 2000). U.S.S.G. § 3B1.2, comment n.3 provides that the determination of whether a mitigating role reduction is appropriate is highly fact-specific and depends upon "the nature of a defendant's relationship to other participants, the importance of the defendant's actions to the success of the venture, and the defendant's awareness of the nature and scope of the criminal enterprise." <u>United States v. Garcia</u>, 920 F.2d 153, 155 (2d Cir. 1990) (per curiam). A minor role adjustment is not available

merely on a showing that "the defendant played a lesser role than his co-conspirators; to be eligible for a reduction, the defendant's conduct must be 'minor' . . . as compared to the average participant in such a crime." Rahman, 189 F.3d at 159 (citing United States v Ajmal, 67 F.3d. 12, 18 (2d Cir. 1995)). U.S.S.G. § 3B1.2, comment n.3.  The determination of whether a mitigating role reduction is appropriate is highly fact-specific and depends upon "the nature of a defendant's relationship to other participants, the importance of the defendant's actions to the success of the venture, and the defendant's awareness of the nature and scope of the criminal enterprise." United States v. Garcia, 920 F.2d 153, 155 (2d Cir. 1990) (per curiam).  A minor role adjustment is not available merely on a showing that "the defendant played a lesser role than his co-conspirators; to be eligible for a reduction, the defendant's conduct must be 'minor' . . . as compared to the average participant in such a crime." Rahman, 189 F.3d at 159 (citing United States v. Ajmal, 67 F.3d. 12, 18 (2d Cir. 1995)).  Our appellate court will review an appellate court's evaluation of a defendant's role-in-the-offense for clear error.  See Castano, 234 F.3d at 113.

Under this standard, the defendant does not satisfy the conditions for a mitigating role reduction.  The evidence clearly shows that this deal could not have gone forward without the defendant.  He spoke on at least three occasions with the

undercover agent, he made sure that he didn't bring "any friends" from New York in the form of law enforcement surveillance and he made sure that everything was calmed. He know doubt was more important to the transaction that was Jesus Contreras.

Despite his claims otherwise, the extent of his involvement with Chibo is belied by his statement to the undercover agent: **"We don't screw around, you know."** Clearly, he knew the organization, he knew what was involved and he knew what he was doing. Moreover, the defendant completely disregards his continued involvement with Chibo when he travels back up to Connecticut in another attempt to pick up the car after it was disabled. Thus, unlike Hugo Jorge or Oscar Gonzalez, Paulino, like Chibo, had more than minor involvement in the transaction and was involved in it on at least two occasions. Accordingly, the defendant's role could not be described just as a runner or a one-time courier. He was intimately involved in the original effort to pick up the drugs and the subsequent efforts to retrieve the car. He knew the organization and he knew its leader. Accordingly, the Court should deny request for a mitigating role adjustment.

   D.   Departure Based on Age

The defendant next moves for a departure based on his age and his claim that he has led a non-criminal life until this incident. This claim is without merit.

As the defendant properly notes, age is not normally relevant to a sentencing decision and would not warrant a downward departure. U.S.S.G. § 5H1.1. Nonetheless, the defendant has not led a blameless, non-criminal life. In fact, as the government explained at the time of the defendant's guilty plea, he was involved in one particular incident in which New York law enforcement officials followed the defendant to an apartment after he had loaded numerous suitcases into his car. Law enforcement knocked on the door but there was no answer. About 45 minutes later someone stuck their head out of the apartment door to see if law enforcement was still there. When they saw law enforcement they fled and the defendant was captured and brought back to the apartment. At the apartment was found $2,600,000 in cash that the defendant and others were counting. The money was later tested for the presence of drugs and it tested positive for the presumptive presence of drugs. This is not the activity of someone who doesn't know what they are doing. He has not led a law-abiding life.

Further, the defendant was found with drugs at the time of his arrest, which he pleaded guilty to in this case. In sum, we have a period from 1999 until his arrest in 2003 during which the defendant was involved in drug trafficking. Simply because he was fortunate enough to not be prosecuted does not change the fact that he as not led, as he describes, a "law abiding life."

Deft. Mem. at 9.

    E.   <u>Non-Guidelines Sentence</u>

The defendant next moves for a non-Guidelines sentence. He has failed, however, to demonstrate that a Guidelines sentence would be unreasonable.

As this Court is aware, the Second Circuit summarized the current state of sentencing law as follows:

> at this point, we can identify several essential aspects of <u>Booker/Fanfan</u> that concern the selection of sentences. First, the Guidelines are no longer mandatory. Second, the sentencing judge must consider the Guidelines and all of the other factors listed in section 3553(a). Third, consideration of the Guidelines will normally require determination of the applicable Guidelines range, or at least identification of the arguably applicable ranges, and consideration of applicable policy statements. Fourth, the sentencing judge should decide, after considering the Guidelines and all the other factors set forth in section 3553(a), whether (1) to impose the sentence that would have been imposed under the Guidelines, i.e., a sentence within the applicable Guidelines range or within permissible departure authority, or (ii) to impose a non-Guidelines sentence. Fifth, the sentencing judge is entitled to find all the facts appropriate for determining either a Guidelines sentence or a non-Guidelines sentence.

<u>United States v. Crosby</u>, 397 F.3d 103, 113 (2d Cir. 2005). The Second Circuit has stated emphatically, however, "that while the principles discussed in <u>Crosby</u> 'change the Guidelines from being mandatory to being advisory,' we have admonished district courts to bear in mind that <u>Booker/Fanfan</u> and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge . . . .

On the contrary, the Supreme Court expects sentencing judges faithfully to discharge their statutory obligation to 'consider' the Guidelines and all of the other factors listed in section 3553(a). United States v. Godding, 405 F.3d 125, 126 (2d Cir. 2005). "To be sure, Booker does not 'render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge.' Id. at 113. The Guidelines sentence now serves, at least, as a marker on the path toward a reasonable sentence. However, it is no longer necessarily the ultimate destination on that path. In the post-Booker regime, district courts effectively must decide whether the applicable Guidelines range represents a reasonable sentence. If, after thorough consideration of the other § 3553(a) factors in light of the particular facts of the case, the sentencing judge determines that the Guidelines sentence is not reasonable, then a non-Guidelines sentence is appropriate." United States v. Jasper, 2005 WL 2414547, *6 (S.D.N.Y. 2005).

   Here, the defendant has failed to demonstrate that a Guidelines sentence is unreasonable. Indeed, he has not identified a single reason why a Guidelines sentence would be unreasonable, other than to say that if the Court feels constrained by the Guidelines, it could in effect disregard them and impose a non-Guidelines sentence. That simply is an insufficient basis to impose a non-Guidelines sentence. As the

18

Second Circuit has noted, "we have admonished district courts to bear in mind that Booker/Fanfan and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge . . . . On the contrary, the Supreme Court expects sentencing judges faithfully to discharge their statutory obligation to 'consider' the Guidelines and all of the other factors listed in section 3553(a)." United States v. Godding, 405 F.3d 125, 126 (2d Cir. 2005).

## CONCLUSION

For the reasons set forth above, the Court should sentence the defendant to a Guidelines sentence.

Respectfully submitted,

KEVIN J. O'CONNOR
UNITED STATES ATTORNEY

By:  ROBERT M. SPECTOR
     ASSISTANT UNITED STATES ATTORNEY
     FEDERAL BAR NO. ct18082

For: JAMES K. FILAN, JR.
     ASSISTANT UNITED STATES ATTORNEY
     915 LAFAYETTE BOULEVARD
     BRIDGEPORT, CONNECTICUT 06604
     (203) 696-3000
     FEDERAL BAR NO. ct15565

CERTIFICATION

This is to certify that a copy of the foregoing was sent via United States Mail, postage prepaid, on this date, to:

Thomas P. Belsky, Esq.
Federal Defender
2 Whitney Avenue, Suite 300
New Haven, CT 06510

Dated at Bridgeport, Connecticut this 18th day of October, 2005.

```
                               _____
                           By: ROBERT M. SPECTOR
                               ASSISTANT UNITED STATES ATTORNEY

                          For: JAMES K. FILAN, JR.
                               ASSISTANT UNITED STATES ATTORNEY
```