UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

FILED

2006 MAR -7 A 9: 47

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| vs. : | CRIMINAL NO. 3:02CR00366(CFD) |
| ADOLFO PAULINO : | March 6, 2006 |

### DEFENDANT'S SUPPLEMENTAL MEMORANDUM IN AID OF SENTENCING

The Defendant, Adolfo Paulino, respectfully submits this supplemental memorandum as an aid to the Court at sentencing, and to specifically address questions raised during a hearing held in this case on October 20, 2005.

**I. Background.**

On October 20, 2005, the Court held a hearing to address several issues related to Mr. Paulino's sentencing. Specifically, the hearing focused on: (1) whether Mr. Paulino qualified for safety valve relief under 18 U.S.C. § 3553(f), and (2) whether he was entitled to a mitigating role adjustment pursuant to § 3B1.2 of the sentencing guidelines. With respect to Mr. Paulino's safety valve eligibility, the government has claimed that Mr. Paulino is not eligible because he has not completely disclosed everything he knew about the offense in question, and therefore did not satisfy all the criteria listed in § 3553(f). The government bases this claim on information provided to them during a proffer session with Oscar Gonzalez, another defendant in this case, wherein Mr. Gonzalez referenced two occasions where he delivered money to Mr. Paulino which was ultimately intended for Osvaldo Vargas ("Chibo"). In light of the government's claim, Mr. Paulino has provided a second proffer letter to address the matters the government has raised, and to hopefully resolve any confusion concerning the depth of his knowledge regarding the offense in question. Mr. Paulino has also offered to meet with the government again in person to address any lingering concerns the government may have.

In addition to the government's safety valve concern, the Court also raised a question during the hearing concerning the proper scope of its inquiry in determining whether Mr. Paulino qualified for a mitigating role adjustment under the sentencing guidelines. Specifically, the Court asked whether, in

making this determination, it could consider Mr. Paulino's role in comparison to unindicted members of the conspiracy addressed in the offense of conviction. Mr. Paulino will address both these issues in turn.

## II. Discussion.

Both of the issues raised above focus not only on Mr. Paulino's actions in relation to the conspiracy in question, but just as importantly, the level to which he appreciated the relevance of his actions and likewise the level of his knowledge and understanding as to nature, depth, and scope of the conspiracy. To fully put into context Mr. Paulino's limited understanding of what he exactly got himself involved with regarding the conspiracy in question, a full review of the facts of this case is warranted.

### A. Facts Surrounding the Conspiracy.

The following information is based on materials the government has provided Mr. Paulino through discovery.

#### 1. Parties Involved in the Conspiracy.

From the materials provided, it appears that Chibo was the center of the conspiracy in question. Chibo trafficked in significant quantities of cocaine, and received his supply from several different sources, including an individual in Colombia known as "El Cartiro." A close associate of Chibo's was Carlos Aquino, who often handled the money for Chibo's drug operation and also transported cocaine for Chibo. Oscar Gonzalez worked with Aquino, and consequently occasionally worked for Chibo as well. An individual known as "El Gordo"[1] served as a "contact person," or "middleman," between Chibo and "El Cartiro." Chibo also associated with other individuals who on occasion would run errands for him. Mr. Paulino was such a person. On at least two occasions, Mr. Paulino drove Chibo to meet with Gonzalez and Aquino to pick up what presumably was drug proceeds, and on two other occasions, Mr. Paulino went by himself to meet with Gonzalez to pick up money for Chibo.

---

[1] Apparently Aquino is also known as "El Gordo" as well. However, Aquino is from the Dominican Republic whereas this "El Gordo" is from Colombia.

Case 3:02-cr-00366-CFD    Document 248    Filed 03/07/2006    Page 3 of 19

- 3 -

### 2. The October 2001 Delivery of Cocaine.

In the Fall of 2001, federal drug agents in both Connecticut and Texas discovered that Chibo had arranged to receive a shipment of cocaine, approximately 120 kilograms, from "El Cartiro." The government's discovery came as a result of an extensive, multi-agency international investigation of a "paramilitary cocaine trafficking organization" that imported cocaine from Colombia to Houston, Texas, with further distribution to the New York City area. On October 12, 2001, Special Agent (SA) Joseph Benson, an agent with the Drug Enforcement Agency's (DEA) Bridgeport office, received a call from agents in Texas that they had intercepted a shipment of cocaine intended for Connecticut/New York, but had managed to keep the seizure secret so that agents could conduct a controlled delivery of the cocaine to Chibo. Pursuant to a plan, undercover agents coordinated with Chibo or his associates (none of whom was Mr. Paulino) to effect the delivery.

Suspecting a legitimate delivery, Chibo met with Aquino on October 16, and arranged for him to meet with several other individuals to facilitate receipt of the drugs. Aquino recruited Oscar Gonzalez, and Hugo Jorge, Gonzalez' cousin, to assist him in the matter, and the three traveled to New Jersey to meet with "El Cartiro," "El Gordo," and another individual known as "Basserone." After some discussion, Gonzalez, Aquino, Jorge, "El Gordo," and "Basserone," traveled to Connecticut to deliver the car that was to be filled with the shipment of cocaine.

Acting at Aquino's direction, and on behalf of Chibo, Gonzalez and Jorge, delivered the "load" car to the undercover agents. The plan was for the parties to return the next day to pick up the car. On the way back to New York, however, Aquino realized that they were being followed by government agents. Aquino then instructed everyone to throw their cell phones out the window. Aquino also called Chibo to cancel their plan to meet up later that evening. Aquino presumably canceled this meeting because of the police surveillance.

The following day, undercover agents engaged in several telephone calls with an individual known to the defense only as "Luciano," who was acting on Chibo's behalf and coordinating with the

- 4 -

undercover agents for the return of the "load" car.[2] It was during these phone calls that the government learned that someone other than Chibo or Luciano would be picking up the car, although at this time the government was not aware that it would be Mr. Paulino. In fact, at this point of the investigation, the government was not aware of Mr. Paulino as he had surfaced at no other point during their investigation. Indeed, the evidence demonstrates that Mr. Paulino became involved in the case only after encountering Chibo on the street outside Mr. Paulino's apartment on the morning of October 17. During this meeting, Chibo asked Mr. Paulino if he would pick up a car for him in Connecticut, and suggested that Mr. Paulino take his friend Jesus Contreras along with him. Chibo then gave Mr. Paulino instructions where to pick up the car, and gave him a cell phone with the number already programed in it, instructing Mr. Paulino to call the number when he arrived at the location in Connecticut. Mr. Paulino did as directed, and contacted the undercover agent upon reaching Connecticut. The agent then met Mr. Paulino and gave him the keys to the car during what amounted to an approximately fifteen-second exchange. Mr. Paulino, however, was unable to return the car to New York because the government had disabled the vehicle.

Pursuant to the government's plan, local police arrived at the scene and questioned Mr. Paulino, who provided the officers his real name and driver's license. This happened to be the only way in which the government learned Mr. Paulino's identity. The police then informed Mr. Paulino that they would need to tow the car, and gave him a business card with the address of where he could retrieve it. Mr. Paulino then returned to New York with Mr. Contreras.

Once back in New York, Mr. Paulino met with Chibo to relay what happened in Connecticut. He also gave Chibo the business card provided to him by the police. Chibo then directed Mr. Paulino to obtain a tow truck and return to Connecticut to retrieve the car. On October 18, Mr. Paulino traveled with a tow truck driver back to Connecticut. However, before reaching the destination, Mr. Paulino learned that he would not be able to retrieve the car because he was not its owner. Given this, Mr. Paulino again returned to Chibo and informed him what took place. Mr. Paulino did not perform any

---

[2] It is clear from the record that "Luciano" was not Mr. Paulino.

- 5 -

tasks for Chibo after this incident, and was arrested approximately 19 months later. Indeed, despite their continued investigation of Chibo, the government has not referenced any evidence suggesting Mr. Paulino's involvement or association with Chibo's organization after the incident in October 2001.

### 3. Proffer Meetings.

#### a. Mr. Paulino's Proffers.

On October 9, 2003, Mr. Paulino met with representatives from the government to conduct a safety valve proffer. In this meeting, Mr. Paulino related everything he could recall about the incident in October 2001. This included explaining his efforts to return to Connecticut the next day at Chibo's request, information the government did not know before Mr. Paulino's disclosure.

In addition to his involvement in the October 2001 incident, Mr. Paulino also explained that he recalled driving Chibo in the summer of 2001 to the intersection of White Plains Road and 222nd Street in the Bronx, to pick up money presumably related to drugs. The proffer session, however, terminated before completion, and to date the government has refused to meet with Mr. Paulino again. Despite this, Mr. Paulino has subsequently provided the government with two "proffer letters" in an effort to satisfy the government, to comply with his obligation under 18 U.S.C. § 3553(f)(5), and to resolve any lingering confusion regarding his involvement in the instant conspiracy.

#### b. Oscar Gonzalez' Proffer.

Unknown to Mr. Paulino at the time of his proffer, Mr. Gonzalez had already met with the government in an effort to obtain a cooperation agreement. During his "proffer" sessions, Gonzalez recalled that on two or three occasions he gave Mr. Paulino drug proceeds intended for Chibo. He also recalled an occasion meeting with Chibo and Paulino in a van parked near the intersection of White Plains Road and 222nd Street in the Bronx, where Gonzalez handed Chibo a paper bag containing approximately $65,000 in drug proceeds.

### B. Mr. Paulino's Safety Valve Eligibility.

The government's objections to Mr. Paulino's safety valve eligibility focuses on Mr. Paulino's apparent failure to disclose three isolated incidents that occurred in the summer of 2001 where Mr.

- 6 -

Paulino either drove Chibo to pick up money from Gonzalez, or where Mr. Paulino met Gonzalez by himself on Chibo's behalf to pick up money. Based on the nature and scope of the government's objections, resolution of this issue necessarily involves two questions: (1) whether Mr. Paulino intentionally or inadvertently failed to pro-actively disclose the incidents in question to the government during his proffer session in October of 2003; and (2) whether this omission, regardless of whether it was intentional or inadvertent, can preclude safety valve eligibility given the comparatively minor nature of the incidents involved. While it is Mr. Paulino's burden to establish that he is safety valve eligible, he only needs to do so by a preponderance of the evidence. United States v. Conde, 178 F.3d 616, 620 (2d Cir. 1999). A review of the facts and circumstances of this case, including all the circumstances surrounding Mr. Paulino's efforts to fulfill his obligation under § 3553(f), demonstrate that the type of information Mr. Paulino failed to disclose, regardless of whether the failure was intentional or inadvertent, is simply not of a nature that would preclude safety valve eligibility, especially given the scope of the information he did provide during his one proffer session and the fact that the session was prematurely terminated.

To fully evaluate this question regarding Mr. Paulino's safety valve eligibility, it is first necessary to review Congress' intended purpose and function for the safety valve. Congress created the safety valve statute in 1994 to remedy two inequities that existed at the time in the mandatory minimum drug sentencing scheme. First, because the mandatory minimum sentences were triggered based solely on the type and quantity of drugs involved, Congress realized that individuals considered the "least culpable offenders" in a given offense were often subject to the same penalty ranges as their more culpable counterparts, without any consideration given to their diminished role in the offense in question. H.R. Rep. No. 103-460 (1994), available at 1994 WL 107571. Additionally, because of their limited involvement, these "least culpable" individuals often did not possess the type of useful information about the offense that their more involved counterparts possessed; information that under 18 U.S.C. § 3553(e) often provided the only way of avoiding an unduly harsh mandatory minimum sentence. See United States v. Cruz, 156 F.3d 366, 375 (2d Cir. 1998). As a result of these circumstances, the least culpable

offenders "often received longer sentences than other, more culpable defendants." Id. To remedy this problem, Congress created the safety valve to specifically provide these "least culpable" defendants with a way of avoiding a mandatory minimum sentence.

As drafted, the safety valve permits a court to sentence a defendant without regard to any mandatory minimum if the defendant satisfies five enumerated criteria. 18 U.S.C. § 3553(f).[3] In light of its purpose and intent, the least significant of these criteria for effecting the statute's intent is the defendant's "proffer" obligation under § 3553(f)(5). United States v. Reynoso, 239 F.3d 143, 153 (2d Cir. 2000) (Calabresi, J., dissenting). As mentioned, the safety valve was intended as an alternate way

---

[3] These factors are, that —

> (1) the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines;
>
> (2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;
>
> (3) the offense did not result in death or serious bodily injury to any person;
>
> (4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in section 408 of the Controlled Substances Act; and
>
> (5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

18 U.S.C. § 3553(f).

of avoiding a mandatory minimum sentence for defendants who simply did not possess useful information that would avail them to 18 U.S.C. § 3553(e). Whereas section 3553(e) is expressly intended as a tool by which the government can obtain valuable information related to criminal activity, obtaining such information is "expressly *not* the point of the safety valve." Id. (emphasis in original). Indeed, "the obtaining of information, and hence its quality – whether it is true or false, helpful to future prosecutions or not – is beside the point of the [safety valve]." Id. Given the limited value the "proffer" requirement plays in effecting Congress' purpose for the safety valve, a sentencing court should construe the provision liberally, and deny relief based on this criterion only where it is clear the defendant has withheld or denied significant drug-related conduct. A survey of Second Circuit case law on this issue supports this conclusion. See United States v. Conde, 178 F.3d 616, 618 (2d Cir. 1999); United States v. Hargrett, 156 F.3d 447, 452 (2d Cir. 1998); United States v. Gambino, 106 F.3d 1105, 1110-11 (2d Cir. 1997).

For example, in Conde, the Second Circuit affirmed a safety valve denial where the defendant denied being the supplier of approximately 400 grams of heroin, despite solid evidence presented at sentencing, including testimony of a co-defendant, establishing that the defendant was indeed the supplier. Conde, 178 F.3d at 618-19. Additionally, in Hargrett, the Second Court affirmed a denial of safety valve relief where the defendant failed to disclose all of the drug transactions he personally performed, including one where the government had actually recorded his participation. Hargrett, 156 F.3d at 452. Finally, in Gambino, the Second Circuit affirmed a safety valve denial where the defendant, despite overwhelming government evidence, "claimed, incredibly, that he had no regular heroin supplier . . . that someone whom he did not know agreed to sell him close to $60,000 worth of heroin . . . [and that he did not] know why [a co-defendant] regularly beeped his pager." Gambino, 106 F.3d at 1110-11.

In contrast to the circumstances involved in these cases, the circumstances at issue in Mr. Paulino's case are much more benign. For example, Mr. Paulino has never denied his association with Chibo, nor the full scope of his involvement in the October 2001 incident, nor the fact that he ran other

errands for Chibo in addition to that incident. Mr. Paulino admitted as much during his initial proffer meeting, and it is important to note that Mr. Paulino did not know at the time of his meeting that Gonzalez had already proffered with the government. Thus, Mr. Paulino thought he was being proactive during his meeting, providing the government with information he believed they did not possess not only regarding the October 2001 incident, but also his driving Chibo to pick up money. However, despite the sincerity of his initial efforts, the government to date has refused to meet again with Mr. Paulino to complete the proffer or resolve any confusion, misunderstanding, or concern about the information he provided. Notably, this refusal is a factor the Court can consider in determining whether Mr. Paulino has fulfilled his obligation under § 3553(f)(5). United States v. Schreiber, 191 F.3d 103, 108 (2d Cir. 1999) ("If, for example, the government refuses from the outset to meet with a defendant, such fact may weigh in favor of finding that a defendant's written proffer is complete.") (emphasis added).

Undeterred by the government's unwillingness to meet again with him, Mr. Paulino has subsequently provided two "proffer letters" to the government in an effort to fulfill his safety valve obligation. Despite this, the government still argues that Mr. Paulino has not been completely truthful based on his failure to proactively discuss no more than three isolated incidents that occurred more than two years before his initial proffer, where Mr. Paulino either drove Chibo to pick up money or picked up money himself on Chibo's behalf. However, given the relatively insignificant nature of the incidents in question, Second Circuit precedent supports the conclusion that these "non-disclosures," regardless of whether they were intentional or inadvertent, should not preclude Mr. Paulino from safety valve relief. This is especially true given that Mr. Paulino at no time denied his association with Chibo or denied any of the conduct at issue, and by all other accounts qualifies as one of the "least culpable" participants in the instant offense.

As a final point on this issue, it is incumbent upon Mr. Paulino to note that the government's skewed perception of Mr. Paulino seems to be based on a misunderstanding of its own evidence. For example, during the trial of Mr. Paulino's co-defendant, Jesus Contreras, the government presented the testimony of Jose Castillo, an immigration officer who served as the undercover agent who gave Mr.

- 10 -

Paulino the keys to the "load car." During his testimony, the government played a tape of a phone conversation between Agent Castillo and Mr. Paulino recorded shortly before Agent Castillo gave Mr. Paulino the keys to the car. Agent Castillo then testified about the conversation, during which the following exchange took place:

> Q. [referencing the taped conversation] . . . And Paulino says: We don't screw around, you know. What did you understand him to be saying there?
>
> A. That they were ready. They were – they weren't – they were being very professional about what they do.
>
> Q. What do you mean professional?
>
> A. Professional in that they weren't a couple of mopes. That they knew what they were doing when it came to this type of transaction.

See Exhibit C.

Additionally, in its initial sentencing memorandum in Mr. Paulino's case, the government referenced this "we don't screw around" comment and argued that "[t]his was evidence that was believed by the jury, show[ed] that Paulino knew exactly what was going on, and that he was part of an organization that did not screw around." Id. (emphasis added). Given this statement, it is clear that part of the government's perception of Mr. Paulino is undoubtedly based on this "we don't screw around" comment. The only problem is that Mr. Paulino never made this comment. An accurate translation of the conversation reveals that he simply stated words to the effect of, "we'll see each other here, you know."[4] See Exhibit D.

Additionally, the government stated in its memorandum that Mr. Paulino "spoke on at least three occasions with the undercover agent, he made sure he didn't bring 'any friends' from New York in the

---

[4] What is particularly concerning about this revelation is that Agent Castillo, who is fluent in both English and Spanish, testified at Mr. Contreras' trial that Mr. Paulino made the phantom "we don't screw around" comment, even after hearing the tape played in open court only moments earlier. It is also important to note that Agent Castillo's testimony is the government's only evidence that Mr. Paulino uttered the phrase "uno viente" in relation to the amount of drugs supposedly in the "load" car. As he indicated in his initial memorandum, however, Mr. Paulino does not believe he uttered that phrase.

- 11 -

form of law enforcement surveillance and he made sure everything was calmed." Gov't. Mem. at 14-15. The government referenced these comments to suggest that Mr. Paulino possessed some sophistication and knowledge about conducting a covert drug transaction. However, the actual phone call to which the government was referring reveals the following exchange:

| | |
|---|---|
| UC: | Did you bring any friends from the other side? |
| Paulino: | Yeah. I brought a friend <u>because</u>. . . |
| UC: | No. No. I mean .. I mean . . . is everything calm, right? |
| Paulino: | Yes everything is calm. |
| . . . | |
| UC: | Have you walked around and everything is fine, eh? |
| Paulino: | Everything is fine, <u>thank you</u>. |

<u>See</u> Exhibit D.

Mr. Paulino's comments, especially the emphasized portions, demonstrate Mr. Paulino's relative ignorance of Agent Castillo's euphemisms. For example, while Agent Castillo used the term "friends" to refer law enforcement surveillance, Mr. Paulino thought he was referring to an actual friend. Moreover, while Agent Castillo used the phrase "everything calm" to inquire whether conditions were right for conducting the transaction, Mr. Paulino thought he was sincerely asking if "everything is fine" with him. Thus, contrary to the government's contention, this exchange reveals Mr. Paulino's obvious inexperience with the sort of activity taking place. However, the government's misinterpretation of Mr. Paulino's comments overall, especially the phantom "we don't screw around" comment, can explain why the government believes Mr. Paulino was more involved in the offense in question than he actually was.

In sum, far from suggesting that Mr. Paulino played a significant role in Chibo's organization, the full scope of the evidence in this case establishes that Mr. Paulino was a peripheral, albeit convenient figure, for Chibo. Perfect proof of this point is the fact that after detecting police surveillance the day before the scheduled pick up of the load car, Chibo chose to send Mr. Paulino and Mr. Contreras to pick up the car instead of keeping with the original plan of either going himself or sending someone more

- 12 -

valuable to his organization. Indeed, the fact that Mr. Paulino was expendable demonstrates the minor role he played in the organization, and accordingly supports the conclusion that the information he proffered, while not precise in every detail, was truthful and complete for purposes of the statute. To be sure, Mr. Paulino and the role he played in the instant offense were precisely what Congress had in mind when drafting the safety valve. Accordingly, under the facts and circumstances of this case, Mr. Paulino warrants safety valve relief.

### C. Mr. Paulino's Eligibility for a Mitigating Role Adjustment.

The Court also asked during the October 20 hearing whether, in determining if Mr. Paulino qualifies for a mitigating role adjustment under section 3B1.2 of the sentencing guidelines, it could compare his role in the offense to other <u>unindicted</u> members of the conspiracy in question, or whether it was limited to only the <u>indicted</u> members of the conspiracy. Given that the guideline provision focuses on "participants" of the offense in question, and not simply "defendants," it is appropriate for the Court to focus on the entire scope of the conspiracy and not just the individuals hauled into court. U.S.S.G. § 3B1.2, comment. n. 3(A); see also United States v. Rojas-Millan, 234 F.3d 464, 472-73 (9th Cir. 2000) (vacating a district court's decision denying a minor role adjustment where the district court improperly limited the scope of its inquiry to only those charged in the offense); United States v. Vicente Fernandez, 312 F. Supp. 2d 522, 524-25 (S.D.N.Y. 2004).

The relevant case law on this issue demonstrates that the determination of a mitigating role adjustment is a "highly fact-specific inquiry in which the 'dispositive consideration' is the defendant's 'culpability in the context of the <u>facts of the case</u>.'" United States v. Mateo, 299 F. Supp. 2d 201, 206 (S.D.N.Y. 2004) (quoting United States v. Garcia, 920 F.2d 153, 155 (2d Cir. 1990) (emphasis added). In light of this, courts have held that a defendant's role in an offense depends, at least to some extent, "<u>on the scope of the criminal activity involved</u>." United States v. Ruiz, 246 F. Supp. 2d 263, 269 (S.D.N.Y. 2002) (emphasis added); see also Garcia, 920 F.2d at 155; Vicente Fernandez, 312 F. Supp. 2d at 524. Thus, while a defendant's actions in a "street level transaction" might compel the conclusion that he played an "important role" in the offense, given the small scope of the crime, the same exact

- 13 -

conduct, when committed as part of a larger conspiracy, would render the conduct minor in comparison to others in the enterprise. Ruiz, 246 F. Supp. 2d at 269. Thus, the comparison of the defendant's culpability in light of the "facts of the case," and not merely in light of his charged co-defendants, demonstrates that the focus of the inquiry should include the entire scope of the conspiracy in question, and not simply those individuals charged with the defendant. The language of section 3B1.2 supports this conclusion where it instructs the Court to focus "on the defendant's role in the offense," and not simply his role in relation to others charged in the offense. U.S.S.G. § 3B1.2 (emphasis added). In light of these considerations, the Court's inquiry on this matter should focus on Mr. Paulino's role in the offense in relation to all the members of the conspiracy, and not simply those individuals the government chose to indict.

Practical considerations also support this conclusion. Were the Court to limit its inquiry to only those individuals charged with a defendant, the government then could effectively "block" a defendant from a mitigating role adjustment simply by manipulating the way in which it indicts a particular case. For example, the government could charge some defendants in one indictment and some in another, thereby diluting the scope of a conspiracy and effectively precluding a defendant's ability to obtain a mitigating role adjustment given his role compared to others charged in the specific indictment with him. Additionally, the government could simply choose not to charge a particular defendant, as it did in this case with Chibo. Mr. Paulino understands that the government chose not to indict Chibo in this case because he was already serving a significant state sentence in New York. While there is nothing wrong with the government's decision not to prosecute Chibo, limiting the Court's scope to only the individual's indicted with Mr. Paulino would improperly skew what was Mr. Paulino's very limited role in a much larger conspiracy. For this reason as well, it is appropriate for the Court to consider all the members involved in the conspiracy when determining whether Mr. Paulino is entitled to a mitigating role adjustment. With this perspective in mind, Mr. Paulino respectfully argues, as he did in his initial memorandum, that he played a very small role in the offense in question, and at a minimum deserves at least a minor role adjustment.

- 14 -

Given that the Court's inquiry on this matter is "highly fact specific," Mr. Paulino respectfully invites the Court's attention to several cases where other courts have granted mitigating role reductions to defendants whose roles were remarkably similar, if not more serious, than that of Mr. Paulino. See United States v. Perez, 321 F. Supp. 2d 574 (S.D.N.Y. 2003); Vicente Fernandez, 312 F. Supp. 2d at 523-25; Mateo, 299 F. Supp. 2d at 203-04, 206-07; Ruiz, 246 F. Supp. 2d at 271-72. For example, the defendant in Ruiz lived in New York but regularly worked directly with an international ecstacy distributor in the Netherlands. Ruiz, 246 F. Supp. 2d at 265-66. He came to the government's attention when he showed up on one occasion to accept a controlled shipment of 47,000 ecstacy pills from an undercover agent. Id. at 266. The defendant, who did not speak English, had even recruited another individual to serve as an interpreter for the transaction. Id. At some point during this meeting, however, the defendant became suspicious of the agents and postponed the transaction. Id. He then called his employer in the Netherlands to discuss what took place. Id. The employer, demonstrating some degree of familiarity with the defendant, assured him that the transaction was safe, and urged him to meet with the agents the following day. Id. The defendant followed the employer's advice and was arrested the next day. Id.

At his sentencing, the district court awarded the defendant a minor role reduction. Id. at 272. Recognizing that the inquiry was highly fact sensitive, the court initially noted that "there is no talismanic set of role definitions that will entitle or disentitle a defendant" from a mitigating role adjustment. Id. at 268. The court further explained that a defendant's "[e]ligibility for the adjustment 'does not turn solely upon [his] status or his assigned task in the criminal enterprise.'" Id. (quoting Garcia, 920 F.2d at 155). Rather, the court concluded that the inquiry should focus on the defendant's role in comparison to the scope of the criminal activity at issue. Id. at 269.

With this framework in mind, the court found several facts warranted a minor role adjustment. First, the defendant was not a longstanding member of the conspiracy with a regular role. Id. at 271. Second, his responsibility in the offense was simply to receive the shipment of drugs and then turn them over to the distributors. Id. On this point, the court noted that the defendant was simply "a buffer hired

- 15 -

to engage in the risky business of taking delivery from potentially dangerous outsiders, limiting the exposure of more important members of the conspiracy. Id. Finally, the defendant not only did not own the drugs, but also expected to receive very little compensation for his efforts, the court noting that "important players in multimillion dollar international transactions do not typically occupy their time while waiting for a significant meeting by working as porters cleaning buildings." Id. at 271-72.

Additionally, it is important to note, that the court found the adjustment proper even in light of a number of significant factors cutting against the defendant's eligibility for a role reduction; namely, that the defendant obviously exercised some discretion in handling his part of the transaction, recruited another person to assist him with the transaction, had direct contact with the leader of the organization, and was trusted to take possession of millions of dollars worth of drugs. Id. at 272. However, while the court acknowledged that the defendant's role was not without significance, it added that

> neither was it critical to the success of the enterprise, except in the trivial sense in which every cog in the machine has to play its part in order for the machine to work. Virtually anyone could have been inserted to accept delivery without threatening the success of the government.

Id. Comparing Mr. Paulino's knowledge and actions in the present case demonstrates that Mr. Paulino's role was actually less involved than the defendant's in Ruiz.

Like the defendant in Ruiz, Mr. Paulino was simply a "buffer" intended to limit Chibo's exposure from the "potentially dangerous outsiders." Proof of this point is the fact that Mr. Paulino does not even come into the picture in this case until other members of the conspiracy noticed the presence of law enforcement surveillance. Moreover, Mr. Paulino did not own the drugs, had no negotiating power regarding the terms of the transaction, and had only known Chibo for less than six months. Finally, like the defendant in Ruiz, Mr. Paulino lived a very modest lifestyle, a fact inconsistent with an individual regularly involved in a large scale drug enterprise.

Morever, Ruiz demonstrates that even the factors that arguably weigh against Mr. Paulino's eligibility for a role adjustment should not preclude an adjustment in this case. While both Mr. Paulino and the defendant in Ruiz had direct contact with the leaders of their respective organizations, this fact did not preclude the adjustment in Ruiz. Additionally, while the government in its initial sentencing

- 16 -

memorandum tried to make much of the fact that Mr. Paulino made a second attempt at Chibo's request to retrieve the load car, see Gov't Mem. at 15, Ruiz demonstrates that repeated efforts to complete a transaction does not necessarily preclude a defendant from a mitigating role adjustment. Ruiz 246 F. Supp. at 266-67. Finally, while Mr. Paulino and the defendant in Ruiz both employed the assistance of another person in their efforts to fulfill their duties, Mr. Paulino did so only at Chibo's direction, and thus, his behavior in this respect is less offensive than the defendant in Ruiz. In short, a comparison of Mr. Paulino's involvement in the instant offense to that of the defendant in Ruiz reveals that Mr. Paulino played a much less significant role in the "scope of the criminal activity involved" in this case, and accordingly warrants a mitigating role reduction.

Additionally, in United States v. Mateo, another case factually relevant to Mr. Paulino's case, the court awarded the defendant a mitigating role adjustment despite the fact that the defendant had regular association with a drug supplier, and attempted to broker two large heroin transactions by providing drug samples to prospective buyers. Mateo, 299 F. Supp. 2d at 203-04. Relevant to the court's decision to award a minor role adjustment was the fact that the defendant "did not know the ultimate source of the drugs, nor any details about the operation of the conspiracy . . . nor did she appear to have any power within the drug conspiracy." Id. at 206-07. While Mr. Paulino did not demonstrate any brokering power or capabilities, which already places him in a better position than the defendant in Mateo, he additionally notes that like the defendant in Mateo, he too did not know the source of the drugs, or that Chibo's operation involved a "paramilitary cocaine trafficking organization" that imported cocaine from Colombia via leer jets. Thus, like the defendant in Mateo, Mr. Paulino warrants a mitigating role adjustment. See also Vicente Fernandez, 312 F. Supp. 2d at 524-25 (awarding the defendant a minor role adjustment despite the fact that he personally transported 1.4 kilograms of heroin from Colombia to New York, where the defendant had no decision making authority and "did not know the type or amount" of drugs, nor anything about the larger trafficking operation.").

Finally, in Perez, the court awarded the defendant a minor role adjustment even though the defendant was a regular salaried employee of a large scale drug distribution ring, worked directly for the

leader of the enterprise, and was personally involved in numerous transactions over an extended period of time. Perez, 321 F. Supp. 2d at 576-78. Based on the amount of drugs involved in the conspiracy, the defendant was held accountable under the sentencing guidelines for more than 1.5 kilograms of crack. Id. at 583. However, in deciding the issue of a role reduction, the court saw the question as one of whether the defendant was "'substantially less culpable' than the typical seller of in excess of 1.5 kilograms of crack." Id. at 585 (emphasis added). In light of the fact that the defendant did not own any of the drugs involved, did not finance the operation, and had no decision-making authority, the court concluded that the defendant's role in the operation entitled him to a role reduction, noting in part the inappropriateness of treating the defendant "at the same level of culpability as . . . his employer, who apparently *did* own the drugs, earn the profits, and make the decisions." Id. at 586-87 (emphasis in original). This same inappropriate outcome would essentially occur in Mr. Paulino's case as well. Despite the fact that Mr. Paulino had no control over the drugs, no decision making authority, nor any understanding of the scope of Chibo's organization, he would still warrant the same base offense level as Chibo. As Perez makes clear, the Court should avoid such a skewed outcome. Interestingly, the fear of such a skewed outcome was, as mentioned, one of Congress' motivating concerns behind the safety valve as well.

## III. Conclusion.

Far from the government's mistaken belief that Mr. Paulino was a significant player in Chibo's organization, the full spectrum of the evidence in this case reveals that Mr. Paulino was at best a very low level, part-time employee. While he had direct connection to Chibo, Mr. Paulino had absolutely no authority in the organization and was fungible or expendable. Indeed, his role in the instant offense demonstrates that Mr. Paulino was a "buffer" between Chibo and other "important" members of the enterprise, and the undercover agents. Unfortunately, the government's misperception of Mr. Paulino, and its belief that he was deceitful during his safety valve proffer, is based in large part on its own misunderstanding of the evidence. Even more unfortunate is the fact that this confusion could have been easily resolved had the government agreed to meet with Mr. Paulino to discuss his involvement. In light

- 18 -

of all this, and based on the arguments made above, Mr. Paulino respectfully requests the Court find that he qualifies for both the safety valve and a mitigating role reduction.

Respectfully submitted,

THE DEFENDANT,
ADOLFO PAULINO

THOMAS G. DENNIS
FEDERAL DEFENDER

Dated: March 6, 2006

*/s/ Terence S. Ward* (For)
Thomas P. Belsky
Asst. Federal Defender
2 Whitney Ave., Suite 300
New Haven, CT 06510
Bar No. ct24770
(203) 498-4200
Email: thomas.belsky@fd.org

### CERTIFICATION

I HEREBY CERTIFY that a copy of the foregoing has been mailed to James Filan, Assistant United States Attorney, United States Courthouse, 915 Lafayette Boulevard, Bridgeport, CT 06604, on this 6th day of March 2006.

*/s/ Terence S. Ward*
Terence S. Ward