UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIM. NO. 3:02CR366 (CFD) |
| | : | |
| v. | : | |
| | : | |
| ADOLFO PAULINO | : | MARCH 14, 2006 |

**UNITED STATES' SUPPLEMENTAL SENTENCING MEMORANDUM**

Defendant Adolfo Paulino stands convicted after a guilty plea of conspiracy to possess with intent to distribute five kilograms or more of cocaine and possession with intent to distribute cocaine. The Government has set forth facts in its previous Sentencing Memorandum, as well as the evidenced adduce at trial, and will not repeat those facts here except as necessary.

At the time of the original sentencing hearing, the Court questioned what the appropriate standard was for deciding claims for mitigating role adjustments. The Government will address that issue in this memorandum. The defendant also submits additional briefing on his claim of eligibility for safety-valve consideration. The Government has addressed that in its earlier filing and in open court. It will add some observations in support of its position that the defendant is not entitled to safety-valve consideration.

## THE PRESENTENCE REPORT

The PSR found that the transaction in this case involved 120 kilograms of cocaine.  The defendant has no Criminal History points, which places him in Criminal History Category I.  The Drug Quantity Table, Section 2D1.1 of the guidelines, places the defendant at Level 36, for at least 50 kilograms but less than 150 kilograms of cocaine.  The PSR gives the defendant two levels for acceptance of responsibility, but the Government has already stated that because the use of the 2002 Guidelines does not effect any other aspect of the sentencing, the Government does not object to their use and the award of three levels for acceptance of responsibility.  Thus, while the PSR calculates the defendant's sentencing guidelines range as Criminal History Category I, Offense Level 34, with a resulting range of 151 to 188 months, the actual Adjusted Offense Level based on the additional point for acceptance is Level 33, with a resulting range of 135 to 168 months.

## THE DEFENDANT'S CLAIMS

The defendant has filed a supplemental sentencing memorandum in which he addresses the mitigating role issue and again attempts to urge his safety-valve eligibility on the Court.

**DISCUSSION**

A.    Mitigating Role Adjustment

In United States v. Carpenter, 252 F.3d 230, 234 (2d Cir. 2001), the Second Circuit explained the method for determining whether a defendant is entitled to a mitigating role adjustment. First, it explained the difference between a minimal role (applies to a defendant who is "plainly among the least culpable of those involved in the conduct of a group") and a minor role (applies to "any participant who is less culpable than most other participants, but whose role could not be described as minimal"). Id. at 234-35.  Carpenter also noted that "[t]he Guidelines further provide that a mitigating role adjustment is appropriate if the defendant is 'substantially less culpable than the average participant.'  Id. § 3B1.2, comment."  Id. at 235.

The Carpenter court also held that "[a] reduction [pursuant to U.S.S.G. § 3B1.2] will not be available simply because the defendant played a lesser role than his co-conspirators; to be eligible for a reduction, the defendant's conduct must be 'minor' or 'minimal' as compared to the average participant in such a crime. . . .  ("Under U.S.S.G. § 3B1.2, the district court is required to gauge the appellant's culpability relative to the elements of the offense of conviction as well as in relation to the co-conspirators.").  Accordingly, the fact that a defendant played a minimal or minor role in his offense "vis-a-vis the role

of his co-conspirators is insufficient, in and of itself, to justify a [mitigating role] reduction." Id. at 235.

In light of Carpenter, it is the Government's position that the Court must make two comparisons before determining whether a defendant is entitled to a mitigating role reduction: a comparison of the defendant's conduct with the average participant in a similar crime nationwide and a comparison of the defendant's conduct with co-conspirators in the offense, whether those co-conspirators are charged or uncharged. Under this standard, the defendant does not satisfy the conditions for a mitigating role reduction.

Comparing the evidence of the defendant's involvement with person's in similar conspiracies around the country, it is clear that his role was not minor. Indeed, what the defendant basically is claiming is that he was nothing more than a low level, poorly paid "courier" or "buffer" between "Chibo" and other members of the organization.[1] As an initial matter, many courts have looked at the actions of couriers and have determined that they are not entitled to minor role adjustments. See, e.g., United States v. Garcia, 920 F.2d 153, 155 (2d Cir. 1990) ("While in certain cases and on particular facts, a district court might conclude that a defendant courier was substantially less culpable

---

[1] While addressing the argument that the defendant was a "buffer" or "courier," the Government is not conceding that such a description is true.

4

than the average participant and thus make a downward adjustment
pursuant to § 3B1.2, this conclusion is by no means mandated.")
(internal quotation marks omitted).  "A defendant's courier
status does not entitle him automatically to the benefit of the
minor and minimal role adjustments.  See Garcia, 920 F.2d at 155.
Nor do limited finances prove that a defendant was a minor or
minimal participant.  See United States v. Adames, 901 F.2d 11,
12 (2d Cir. 1990).  A sentencing court is not bound to accept
defendant's self-serving characterizations of his role in an
offense.  It is not defendant's exact role or status in the
criminal activity that necessarily decides this question; rather,
it is an assessment of defendant's culpability in the context of
all the circumstances."  United States v. Shonubi, 998 F.2d 84,
90 (2d Cir. 1993).  See also United States v. Ravelo, 370 F.3d
266, 270 (@d Cir. 2004) ("Ravelo's contention that he was only
following orders does not require a contrary conclusion.  Perhaps
it indicates that Ravelo did not conceive the crime, but it does
not show that he was ""substantially less culpable than the
average participant.").

     "The culpability of a defendant courier must depend
necessarily on such factors as the nature of the defendant's
relationship to other participants, the importance of the
defendant's actions to the success of the venture, and the
defendant's awareness of the nature and scope of the criminal

enterprise." Garcia, 920 F.2d at 155.  Looking at all these
circumstances, then, the defendant's role cannot be described as
minor.

First, the defendant was entrusted with picking up 120
kilograms (264 pounds) of cocaine.  We are not dealing with a
small level operation and the defendant played a critical role in
the venture.  Indeed, the defendant made arrangements to pick up
an incredible amount of cocaine.  He recruited a driver to assist
in the enterprise.  He spoke with the undercover agent on three
occasions to set up the meeting and to make sure that everything
was going to work out.  These are not the actions of an unknowing
drug courier.

Next, the defendant made "heat runs" to make sure that there
was no surveillance.  He and Contreras staked out the T.J. Maxx
parking lot.  As the Court no doubt remembers from the trial, the
defendant walked back and forth many times, looking for the
person delivering the load car.  Once the load car was delivered,
the tape shows that the defendant walked right past the load car
and to the car he came in and then was driven to the load car.
These are not the actions of a person who does not know what is
going on or is simply going to pick up "something" for another
person, i.e., a courier.  These are the actions of a person who
knew what was happening and what he need to do to make the

6

venture a success.[2]  He was intimately involved in the original effort to pick up the drugs and the subsequent efforts to retrieve the car.  He knew the organization and he knew its leader.

He no doubt was more important to the transaction than was Jesus Contreras, who was only involved on one date, and only received a two point minor role reduction.  Contreras did not have telephone conversations with the undercover officer. He did not make the arrangements for the pick up.  He did not go back the following day for the car.[3]

Paulino, on the other hand, not only did all of those things, but he was also involved in drug trafficking for Chibo on other occasions.  The Government is aware of other instances in which Paulino drove Chibo on his drug business.[4]  Paulino was involved in a $2.6 million money transaction as was described in earlier proceedings.  This is not the description of an innocent,

---

[2]  Contrary to the defendant's assertions, undercover agents did in fact coordinate with Paulino.

[3]  The defendant makes much of the phrase "we don't screw around."  The Government stands by the translation from the original trial.  Nonetheless, it is a red herring.  It in no way changes the facts surrounding the defendant's participation in this transaction, his comparison to other drug traffickers convicted of similar crimes, or his relationship to others in the organization.

[4]  The Government disagrees with the defendant's efforts to paint his October 17, 2001 involvement in the case as arising out of some sort of a chance encounter with Chibo out on the street on that date.  Paulino has a history with Chibo and a history of drug trafficking.

whether compared to other traffickers, other participants or
other defendants.  Accordingly, the Court should deny request for
a mitigating role adjustment.

B.   <u>Safety Valve Consideration</u>

The defendant continues to maintain that he is entitled to
safety valve consideration.  The government maintains that the
defendant does not satisfy the requirements because he has not
been fully forthcoming in his statements to the government or, in
fact, to the Court or probation.[5]

As the Government has noted, it does not dispute that the
defendant satisfies factors (1) through (4).  The defendant has
not, however, been truthful to the government concerning his role
in the offense.  Indeed, the defendant has given a number of
misleading statements to the government, the Court and the
probation office.  For instance, at the time of his guilty plea,
the following exchange took place:

THE COURT:     Mr. Paulino, do you agree with the
prosecutor's summary of what you did?

THE DEFENDANT: Yes.

THE COURT:     Is there anything that he said that you
disagree with?

THE DEFENDANT: Regarding the 120 kilos, I didn't know about

---

[5]  The Government discussed the law in its earlier filing and
will not repeat that discussion here.

that amount.

THE INTERPRETER:    Your Honor, the interpreter is going to confirm the last statement.

THE DEFENDANT: I didn't know what the amount was.

THE COURT:    Mr. Paulino, did you know that in the load car there was going to be ten kilograms of cocaine?

THE DEFENDANT: I didn't know what amount they were going to put in.

THE COURT:    Did you know that it was going to be over five kilograms of cocaine?

THE DEFENDANT: No.

Guilty Plea Tr. at 39-40.

The Court found at the sentencing of Jesus Contreras that Contreras knew that there was 120 kilograms of cocaine in the load car.  Paulino recruited Contreras.  Paulino worked with Chibo in the past.  Clearly, his statement is not truthful.

In his interview with the probation officer, the defendant "stated that the man arrived with the car and approached him. Mr. Paulino was supplied the keys to the car and was informed that there was "120 kilos in the trunk.  He told me not to look." PSR § 22.  At that point defense counsel terminated the interview.

At the time he was interviewed by the government, the defendant gave conflicting statements, first saying that he knew

there were drugs in the trunk and then saying that he knew there was "something" in the trunk and that it was either drugs or money. Further, in his earlier sentencing memorandum, the defendant stated that he does not remember having any information about the transaction in question and he apparently maintains that position. The bottom line regarding the amount is that the defendant has given conflicting statements about what he knew and when he knew it and his inability to tell the truth precludes him from receiving safety-valve consideration. He has not told the truth, and he continues to minimize his role in this transaction and Chibo's organization itself.

For instance, he stated to the government that he only drove Chibo around on two occasions; yet the government has evidence that this information is not accurate. Further, the defendant has made blatantly false statements about the drugs that were found in his son's possession at the time of his arrest. He now states that the drugs in his son's room belonged to a person who is now dead. At the time of his arrest, however, the defendant made no such statement. Indeed, these statements are only being used to offer his son, who was convicted in federal court in New York of a drug charge based on the drugs found in his closet, an appellate issue. The statements are being used in an effort to help his son get a new trial. It should be noted that the defendant did not come forward with this explanation until after

his son was convicted on that charge.  Again, the bottom line is that the defendant is manipulating the judicial system, government agents and the Court to serve his own interests.  He has not been truthful about his role in the offense or his knowledge about the transactions.

The best evidence of the knowledge that Paulino had concerning the drug trafficking and his role in it is the evidence presented at the trial of Jesus Contreras.  The Government again directs the Court's attention to the efforts made by Paulino on the day in question as shown on the videotape and the transcript of the conversations presented at trial.  This is evidence that was believed by the jury, shows that Paulino knew exactly what was going on, and that he had more than a minor role in the organization.[6]  His protestations that he was unaware of what was transpiring are unavailing and his incomplete and inconsistent statements demonstrate that he has not satisfied the requirements for earning a safety-valve reduction.

---

[6]    The Government notes that the evidence was never that Chibo's organization used Leer Jets to move drugs from Colombian paramilitary organizations.  The use of the DEA jet was part of the undercover operation after the Government took control of the drugs.

**CONCLUSION**

For the reasons set forth above, the Court should sentence the defendant to a Guidelines sentence.

                         Respectfully submitted,

                         KEVIN J. O'CONNOR
                         UNITED STATES ATTORNEY


                    By:  ANASTASIA KING
                         FEDERAL BAR NO. ct24192


                    For: JAMES K. FILAN, JR.
                         ASSISTANT UNITED STATES ATTORNEY
                         915 LAFAYETTE BOULEVARD
                         BRIDGEPORT, CONNECTICUT 06604
                         (203) 696-3000
                         FEDERAL BAR NO. ct15565

<u>CERTIFICATION</u>

This is to certify that a copy of the foregoing was sent via email on this date, to:

Thomas P. Belsky, Esq.
Federal Defender
2 Whitney Avenue, Suite 300
New Haven, CT 06510

Dated at Bridgeport, Connecticut this 14th day of March, 2006.

_____
By:  ANASTASIA KING
     ASSISTANT UNITED STATES ATTORNEY

For: JAMES K. FILAN, JR.
     ASSISTANT UNITED STATES ATTORNEY

13