UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| vs. | : | CRIMINAL NO.  3:02CR00366(CFD) |
| ADOLFO PAULINO | : | March 30, 2006 |

<u>DEFENDANT'S REPLY TO GOVERNMENT'S</u>
<u>SUPPLEMENTAL SENTENCING MEMORANDUM</u>

The Defendant, Adolfo Paulino, respectfully submits this reply to the government's supplemental sentencing memorandum filed March 14, 2006.

Given the severity of the possible sentences at stake, Mr. Paulino respectfully must comment on the government's factual inaccuracies relating to this case, and how its misperception no doubt influences the rigid stance it has taken regarding Mr. Paulino's safety valve eligibility as well as his eligibility for a mitigating role adjustment.  However, once one dispenses with these inaccuracies, it becomes clear that Mr. Paulino, as he has repeatedly stated and as the record demonstrates beyond a reasonable doubt, was nothing more than an expendable tool in Chibo's organization.  Mr. Paulino had no real responsibility whatsoever, and was a convenient patsy for other more important players in Chibo's scheme.  Moreover, Mr. Paulino has been truthful with the government, probation, and the Court throughout this case.  Accordingly, he is eligible for both safety valve and a mitigating role adjustment.

Turning to the government's inaccuracies, they claim that Mr. Paulino "made arrangements to pick up an incredible amount of cocaine," insinuating that Mr. Paulino was somehow involved in planning the transfer of the cocaine in this case.  <u>See</u> Gov't memo of Mar. 14, 2006, at 6.  However, nowhere in the record is Mr. Paulino heard or seen planning anything associated with the transfer.  On October 16, 2001, the day before Mr. Paulino became involved in the case, government surveillance video and audio reveals a host of individuals, none of whom were Mr. Paulino, communicating with government agents and dropping off the load car for transfer of the shipment in question.  On the morning of October 17, government recordings also reveal that "Luciano," another person from Chibo's

- 2 -

organization, spoke with a government agent several times that day, and made intricate plans for pick up of the load car. Luciano even stated at one point that he intended to call off the pick up in light of police surveillance observed the day before, although the government agent was able to persuade him to keep with the original plan. However, Luciano did inform the agent that he was no longer going to personally pick up the car, but instead send someone in his place. This was the point at which Mr. Paulino's fate was sealed. Luciano, fearing police involvement based on what happened the day before, decided to send someone expendable in his place in case the pick up was a police set up.

At no point, however, either before or after this fateful decision, is Mr. Paulino heard or seen making arrangements for the pick up. In fact, the first time Mr. Paulino appears in the government's evidence is when he calls Special Agent Castillo (the undercover agent) to inform him that he is at the meet location. <u>See</u> Exhibit D. It is important to note that the call from Mr. Paulino came from the same cell phone number the agents used earlier that morning to contact Luciano. This supports the veracity of Mr. Paulino's statements made during his safety valve proffer, that Chibo gave Mr. Paulino his cell phone with a number programmed into it, and told Mr. Paulino to call the number when he arrived at the location in question.[1] Thus, contrary to the government's assertions, Mr. Paulino played absolutely no role in planning the events of October 17, 2001.

Next, the government alleges that Mr. Paulino "spoke with the undercover agent on three separate occasions to set up the meeting and to make sure that everything was going to work out." <u>See</u> Gov't memo of Mar. 14, 2006, at 6. Obviously, this comment is made to suggest that Mr. Paulino had a greater level of involvement in the events that took place. However, the record reveals that Mr. Paulino made only the one phone call to the agent, already referenced above, to let him know he was at the meet location, and then engaged in the brief conversation captured on video when the agent gave Mr. Paulino the keys to the load car. These facts are entirely consistent with Mr. Paulino's position all along that he was a minimal participant in the events in question.

---

[1] Based on the evidence, it is also the defense's belief that Luciano may in fact have been Chibo.

- 3 -

Finally, the government claims that Mr. Paulino made "'heat runs' to make sure there was no surveillance." See Gov't memo of Mar. 14, 2006, at 6. However, there is simply no evidence supporting this claim, and Mr. Paulino denies engaging in any such behavior. Absent the aforementioned errors regarding the evidence, the record demonstrates that Mr. Paulino came into the events in question at the very last moment. He had no authority over any of the terms or conditions of the transfer in question, and had no real responsibility other than to pick up the load car and return it to Chibo. These facts, among others already discussed, demonstrate that Mr. Paulino has been truthful in his safety valve proffers, and additionally is entitled to a mitigating role adjustment.

The government also argues in its memorandum that Mr. Paulino is ineligible for a role adjustment when compared to Mr. Contreras who already has received such an adjustment. See Gov't memo of Mar. 14, 2006, at 7. First, however, there is no prohibition from more than one person receiving a mitigating role adjustment in a given case. Moreover, Mr. Paulino and Mr. Contreras played nearly identical roles in the events in question. Both were mere cogs in Chibo's drug trafficking machine, expendable commodities that served as buffers between the police and the "important" people of Chibo's organization. While the evidence suggests that Mr. Paulino did have more personal connection to Chibo than Mr. Contreras did,[2] the cases Mr. Paulino has cited in his earlier papers demonstrate that this fact does not preclude a person from receiving a mitigating role adjustment. See United States v. Mateo, 299 F. Supp. 2d 201, 206 (S.D.N.Y. 2004); United States v. Perez, 321 F. Supp. 2d 574 (S.D.N.Y. 2003); United States v. Ruiz, 246 F. Supp. 2d 263, 269 (S.D.N.Y. 2002). Accordingly, Mr. Paulino is entitled to a mitigating role adjustment.

Finally, the government points to various comments Mr. Paulino has made throughout this case to suggest that he has been untruthful and "manipulating the judicial system." See Gov't memo of Mar. 14, 2006, at 8-11. First, the government claims Mr. Paulino gave "conflicting" statements during his safety valve proffer, stating that he first said there were drugs in the trunk of the load car, and later said

---

[2] This suggestion is made only because it is unclear how much interaction Mr. Contreras actually had with Chibo.

- 4 -

there was "something" in the trunk. Id. at 9-10. However, these statements are consistent with what Mr. Paulino has repeatedly said throughout this case: 1) that he had no firsthand knowledge of what was in the trunk, although he reasonably believed it was either drugs or something drug related; and 2) upon learning that there were drugs in the trunk, that he had no firsthand knowledge of the quantity involved. Looking at the statements referenced by the government through this lens demonstrate that Mr. Paulino's comments throughout this case have been consistent and truthful.

The government also tries to make much of comments Mr. Paulino made regarding the drugs found in his son's room the day of his arrest in May, 2003. The government claims that Mr. Paulino's statements alleging his association with the drugs are only now being made to help with his son's appeal in federal court in New York. Id. at 10. However, contrary to these allegations, Mr. Paulino has made statements regarding his connection to the drugs as early as June 2, 2003. In order to fully understand the scope of this issue, a full recitation of the events surrounding Mr. Paulino's arrest is helpful.

According to a DEA report, on May 7, 2003, federal agents arrested Mr. Paulino at his apartment in the Bronx, New York. Present in the apartment along with Mr. Paulino, were his wife, daughter, and son, Christian. The agents ordered all the occupants into the living room, obtained Mr. Paulino's consent to search the apartment, and began an exhaustive search. At one point, agents found a quantity of cocaine in a hall closet. This closet was visible from the living room, where Mr. Paulino was sitting at the time of the discovery. Agents then asked Mr. Paulino about the drugs, to which Mr. Paulino explained that a "friend of a friend" dropped them off for Mr. Paulino to hold.[3] These drugs found in the closet formed the basis for the one count information to which Mr. Paulino pled guilty.

Later during the search, agents found a quantity of drugs in Christian Paulino's room. However, there is no indication that Mr. Paulino was questioned about these drugs. Mr. Paulino did, however,

---

[3] This comment is consistent with statements Mr. Paulino made in his safety valve proffer letter to the government, dated August 11, 2005, wherein he explained that an individual named Julio Caesar gave Mr. Paulino the drugs to "cut" and package. As mentioned in other briefings, this letter was one of two Mr. Paulino provided the government in an effort to satisfy them that he was safety valve eligible.

- 5 -

explain in his proffer letter to the government that an individual named Richard gave him these drugs to "cut" as well.  It is also understood that there was a significant disparity between the purity levels of the two quantities of drugs found in Mr. Paulino's apartment, further verifying Mr. Paulino's statements that the drugs came from different sources, and were given to him to "cut."

On June 2, 2003, after Mr. Paulino's arrest and release on bond, he and his wife reported to the Federal Defender Division of the Legal Aid Society in New York, and met with one of the attorneys involved in Christian's case.  At this meeting, Mr. Paulino stated that the drugs found in Christian's closet, and with which the government had charged Christian, were given to Mr. Paulino and did not belong to Christian.  On December 15, 2003, Mr. Paulino also wrote the judge handling Christian's case and informed her that the "cut" found in Christian's room, "was given to [Mr. Paulino] to hold by a friend named Richard on the 19 [sic] of December 2002 because he was going on a trip to Santo Domingo."[4]  Despite Mr. Paulino's statements, the judge did not allow them at Christian's trial.  These facts demonstrate though that, contrary to the government's assertions, Mr. Paulino's comments regarding the drugs found in his son's room are not an attempt to "manipulate" the system, or give his son an issue on appeal, but a consistent, determined effort to explain the true facts.

In short, unlike the government's claims, which have been based on misinformation and conjecture, Mr. Paulino's statements throughout this case have been consistent, well-founded, and wholly supported by the record.  Accordingly, it is appropriate for the Court to conclude, based on Mr. Paulino's accurate interpretation of the facts and the record as a whole, that he is eligible for safety valve relief and a mitigating role adjustment.

Respectfully submitted,

THE DEFENDANT,
ADOLFO PAULINO

THOMAS G. DENNIS
FEDERAL DEFENDER

---

[4] Mr. Paulino relayed this identical information to the government in his proffer letter in August 2005.

- 6 -

Dated:  March 30, 2006

Thomas P. Belsky
Asst. Federal Defender
2 Whitney Ave., Suite 300
New Haven, CT 06510
Bar No. ct24770
(203) 498-4200
Email: thomas.belsky@fd.org

## CERTIFICATION

I HEREBY CERTIFY that a copy of the foregoing has been mailed to James Filan, Assistant United States Attorney, United States Courthouse, 915 Lafayette Boulevard, Bridgeport, CT 06604, on this 30th day of March 2006.

Thomas P. Belsky